**STATE of Missouri, Plaintiff/Appellant,**

v.

**Michael DOWELL,
Defendant/Respondent.**

**No. ED 92846.**

Missouri Court of Appeals,
Eastern District,
Division Two.

March 23, 2010.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 4, 2010.

Application for Transfer Denied
June 29, 2010.

Shaun J. Mackelprang, John M. Reeves, Jefferson City, MO, for Plaintiff/Respondent.

Thomas E. Marshall, Columbia, MO, for Defendant/Appellant.

Before SHERRI B. SULLIVAN, P.J., ROBERT G. DOWD, JR., J., and PATRICIA COHEN, J.

SHERRI B. SULLIVAN, P.J.

*Introduction*

The State of Missouri (the State) appeals from the judgment of the trial court granting Michael Dowell's (Respondent) motion to dismiss with prejudice the State's charge against him of the aggravated forcible rape of Victim, Section 566.030,[1] based on collateral estoppel resulting from Respondent's acquittal by jury of first-degree murder and its lesser-included offenses in a prior trial involving the same victim and the same underlying events. We affirm.

*Factual and Procedural Background*

On January 5, 1991, Victim attended a wedding reception in Old Monroe, Missouri. After leaving the reception at approximately 11:30 p.m., Victim's car became stuck just off Route N on Big Box Road. Glen Corter (Corter), who had been driving behind Victim from the reception that he had also attended, stopped to assist Victim, but could not get her car out of the ditch. Corter testified he took Victim to pick up Sheila Weber's (Weber) baby from babysitter Melissa Young (Young) and drop the baby off at Weber's house and then looked for someone with a 4–wheel drive vehicle to pull Victim's car out of the ditch. Corter testified that he found a couple with a truck at a convenience store willing to help and so he took them to Victim's car. Corter stated that after Victim's car was successfully pulled out, Victim gave Corter a bottle of Schnapps and brandy and they went their separate ways. Dennis Noack (Noack), who worked at the Convenience Corner gas station, located at the intersection of Route 79 and Route 47, testified that he saw Victim at about 2:00 a.m., looking like she had a bad night. Noack testified that Victim bought a burrito, talked about the roads getting bad due to the winter weather, and said she "had to go down on Highway W," which is about eight miles west of the gas station on Route 47. Weber testified that Victim returned to Weber's house alone at 2:30 a.m. Weber said Victim seemed upset and declined an offer to spend the night. John Greco (Greco), who had also attended the reception, testified that he saw Victim parked at Charlie's Liquor store on Route 47, near the intersection of Route 47 and Highway W, at approximately 2:30 a.m.

On Sunday, January 6, 1991, Victim's car was seen in a driveway off Highway W, less than a quarter mile north of Route 47. The car had a blown tire that looked like it had been driven on for a while. Deputy Sheriff Michael Chidster (Chidster) testified that tire tracks in the snow indicated the car had pulled into the drive from the north, and that the vehicle had been driving on W from a northerly direction coming back toward Highway 47. North on Highway W was the opposite direction from Victim's home. The driver's seat was found pushed all the way back. Victim's mother testified that Victim was five feet five inches or five feet six inches tall and always drove with the seat pulled very close to the steering wheel.

On Monday, January 7, 1991, at approximately 2 or 3 p.m., Billy Collins (Collins), who lived nearby, found Victim's body in a ditch on Highway W several miles north of Route 47. Mark Sprock and Gilbert Rimel had actually seen the body from a distance, thought it might be a mannequin,

[1] All statutory references are to RSMo Cum. Supp.1990, unless otherwise indicated.

went to Collins' house, and Collins agreed to go down and determine if the body was real. Collins touched Victim's body, found it was soft and that her feet were dirty, and called the Lincoln County Sheriff's Department.

Dr. Mary Case (Dr. Case) of the St. Louis County Medical Examiner's Office performed the autopsy of Victim. Dr. Case found seven lacerations on Victim's scalp. Dr. Case noted numerous bruises and abrasions on Victim's body, which she determined were caused by blunt trauma. Dr. Case concluded that the cause of Victim's death was closed head injury caused by blunt force trauma. She testified that all of Victim's injuries were consistent with having occurred at or around the same time. Dr. Case also made a finding of probable sexual assault, based upon the circumstances in which Victim was killed, to-wit: she was killed up-close, out of public view and her clothing was removed. Dr. Case opined that these circumstances suggested a sexual assault.

Dr. Case also found six "tiny, very superficial" lacerations, one to three millimeters or 1/25th to 3/25ths of an inch in length, in the posterior fourchette, of the inferior margin of the vagina. Dr. Case noted the lacerations could have resulted from consensual sex, and did not use these tiny lacerations as the basis of her opinion of probable sexual assault.

Dr. Thomas Young (Dr. Young), former medical examiner for Jackson County, disagreed with Dr. Case's finding of probable sexual assault. Dr. Young opined that the "tiny lacerations" were "little, tiny, yellowish scrapes ... post-mortem scrapes that were made well after she died." Dr. Young's opinion was that because there was no evidence of blood on the scrapes or

in the underpants,[2] it was doubtful the injuries occurred while she was alive. Dr. Young believed that the absence of blood on Victim's body, bra, and underpants indicated that Victim was physically assaulted while fully clothed.

Although there was a lack of blood, Grant found a semen stain on Victim's underpants. Grant was unable to detect semen in a vaginal wash sample taken from Victim's body but detected semen on a vaginal swab. The vaginal swab was analyzed using the most recent DNA detection method of the time, "RFLP," and a DNA profile was created. Grant found no sperm cells in the vaginal wash, vaginal smears, rectal smears, underpants or oral smears.

In April, 2000, Brian Hoey (Hoey) of the MSHPL, analyzed the evidence using the newer "PCR–STR" process to generate a DNA profile. Material from the vaginal swab had been used up in earlier analysis, and Hoey found no male DNA in either the vaginal wash or the smears from the vaginal wash. However, Hoey was able to extract DNA from the underpants in the form of semen. Hoey's analysis of the material from the underwear showed the absence of sperm and several peak height imbalances in the DNA alleles, both of which suggest degradation, in that the sample had possibly been there for several days. Hoey testified that semen and sperm samples can survive up to five days on the human body. He further testified that semen samples with no sperm in them are generally deemed over 72 hours old.

In December of 2006, Respondent gave a blood sample which was analyzed for DNA using the PCR–STR process. Profiles generated by PCR–STR cannot be

2. Thomas Grant (Grant) of the Missouri State Highway Patrol Laboratory (MSHPL) found no blood on Victim's underwear.

compared to profiles generated by RFLP. Hoey compared a sample of Respondent's DNA, taken from a blood sample, to the DNA taken from the underwear and found them consistent. Hoey could not determine when the sample had been left, the circumstances surrounding when it was left, or whether the contact was consensual.

The State charged Respondent with first-degree murder, armed criminal action, rape, and in the alternative, rape with infliction of serious physical injury. After a change of venue, the Boone County circuit court dismissed the armed criminal action and the rape count as time-barred. Because the State sought the death penalty, the rape with the infliction of serious physical injury count was severed as required by Section 565.004.1.

Respondent filed a Motion to Present Evidence of Third Party Guilt as to Corter, which the trial court granted in part. At the wedding reception Corter had been drunk and grabbed Victim's arm, trying to dance with her. Victim had pushed him away. Corter also was with Victim the night she disappeared. Corter also confessed to four people after Victim's death that he had killed her, to-wit: Kimberly Faye Gott (Gott), who testified that she was attending a party at a friend's house when Corter cornered her downstairs, laughed, and said he killed Victim. Gott reported the incident to the police and filed a written statement. Weber testified that she and a friend were at a bar in Winfield when Corter approached them. They asked the bouncer to remove him from the bar, and Corter stated that if they kept it up, that they would "end up dead just like [Victim]." Christine Dubach (Dubach), the same witness who had seen Corter grab Victim at the reception, testified that in 1994, she was at the Flat Rock swimming hole with her three daughters and others when Corter stated "You remember [Victim]? Well, I killed her. I'm getting by with it." Christina Kirby (Kirby) testified that in the spring of 1994, Corter was at her apartment during a gathering and stated that he had beaten Victim with a crowbar. Dennis Anderson (Anderson) testified that several months before Victim's death, he had seen Corter and another man, not Respondent, trying to force Victim into a truck. Anderson testified he intervened.

On October 3, 2008, after trial, the jury found Respondent not guilty of first-degree murder, and the lesser included offenses of second-degree murder and involuntary manslaughter. Respondent moved to dismiss with prejudice the remaining rape with the infliction of serious physical injury count based on collateral estoppel. Over Respondent's objection the trial court granted the State's Motion to Dismiss without prejudice. The State then filed the same rape charge with the infliction of serious physical injury in Lincoln County circuit court. Respondent again moved to dismiss with prejudice based on collateral estoppel. After a hearing, the trial court granted the motion. This appeal follows.

### Point on Appeal

The State contends that the trial court erred in dismissing the State's prosecution of Respondent for aggravated forcible rape on the grounds of collateral estoppel because when Respondent's first jury acquitted Respondent of murdering Victim, the jury did not necessarily make factual findings acquitting Respondent of aggravated forcible rape against Victim, in that the jury could have simply concluded that Respondent did not have the culpable *mens rea* for any degree of murder, i.e., the jury could have concluded that Respondent committed aggravated forcible rape against Victim, a crime that has no *mens*

*rea,* but that Respondent did not possess a culpable mental state as regards murder in causing Victim's death.

### Standard of Review

██ Collateral estoppel and equitable estoppel are affirmative defenses. *Ryan v. Ford,* 16 S.W.3d 644, 647 (Mo.App. W.D. 2000). Sustaining a motion to dismiss based on an affirmative defense requires that the defense be irrefutably established by the pleadings. *Id.* "Our review of a motion to dismiss assumes 'every fact pleaded in the petition to be true.'" *Id.,* quoting *Honigmann v. C & L Restaurant Corp.,* 962 S.W.2d 458, 459 (Mo.App. E.D. 1998). "Moreover, '[a] plaintiff is entitled to the benefit of every favorable inference which may reasonably be derived from the facts pleaded.'" *Ryan,* 16 S.W.3d at 647–48, quoting *Honigmann,* 962 S.W.2d at 459. "Although a trial court's evidentiary findings warrant deference from the appellate courts, that deference does not apply where the law has been applied in error." *Ryan,* 16 S.W.3d at 648. "We review determinations of law de novo." *Id.*

### Discussion

██ Collateral estoppel involves the determination of an issue of ultimate fact by a valid and final judgment. *State v. Johnson,* 485 S.W.2d 106, 112 (Mo.1972). The doctrine of collateral estoppel only applies in a criminal case when the issue determined in the prior case is the same as the issue in the pending case. *State v. Manning,* 682 S.W.2d 127, 130 (Mo.App. E.D.1984), citing *State v. Thomas,* 625 S.W.2d 115, 125 (Mo.1981). The application of collateral estoppel is a doctrine which is embodied in the 5th Amendment guarantee against double jeopardy. *State v. Coleman,* 773 S.W.2d 199, 200 (Mo.App. E.D.1989); *Ashe v. Swenson,* 397 U.S. 436, 445, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970);

*State v. Booker,* 540 S.W.2d 90, 92 (Mo. App.St.L.1976). Collateral estoppel "'means simply that when an issue of ultimate fact has been determined by a valid final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Coleman,* 773 S.W.2d at 201, quoting *Ashe,* 397 U.S. at 443, 90 S.Ct. 1189. "To establish that the present prosecution is barred by defendant's prior acquittal, 'the burden is on [defendant] to show that the verdict there necessarily decided the issues now in litigation.'" *Coleman,* 773 S.W.2d at 201, quoting *Booker,* 540 S.W.2d at 93.

In *Ashe,* the Supreme Court stated that when the previous acquittal was based on a general verdict, the collateral estoppel inquiry 'requires a court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' *Coleman,* 773 S.W.2d at 201, quoting *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189. "Recently our Supreme Court has expressed the view that collateral estoppel forecloses consideration of an issue only when that issue was unambiguously decided in the earlier case." *Coleman,* 773 S.W.2d at 201, citing *State v. Rodden,* 728 S.W.2d 212, 220 (Mo. banc 1987). "'Since it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel defense will be available to a defendant.'" *Booker,* 540 S.W.2d at 93, quoting *United State v. Tramunti,* 500 F.2d 1334, 1346 (2d Cir.1974).

"Collateral estoppel is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice." *Ashe,* 397 U.S. at 443, 90

S.Ct. 1189. "It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* "Although first developed in civil litigation, collateral estoppel has been an established rule of federal criminal law at least since this Court's decision more than 50 years ago in *United States v. Oppenheimer*, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161." *Id.* "As Mr. Justice Holmes put the matter in that case, 'It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect from a liability in debt.' " *Id.*, quoting *Oppenheimer*, 242 U.S. at 87, 37 S.Ct. 68.[3] "As a rule of federal law, therefore, '(i)t is much too late to suggest that this principle is not fully applicable to a former judgment in a criminal case, either because of lack of 'mutuality' or because the judgment may reflect only a belief that the Government had not met the higher burden of proof exacted in such cases for the Government's evidence as a whole although not necessarily as to every link in the chain.' " *Id.*, quoting *United States v. Kramer*, 289 F.2d 909, 913 (2d Cir.1961).

The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'

*Id.* at 443–44, 90 S.Ct. 1189. "The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' " *Id.* at 444, 90 S.Ct. 1189, quoting *Sealfon*, 332 U.S. at 579, 68 S.Ct. 237. "Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal."[4] *Id.*

To establish that the present rape prosecution is barred by the murder acquittal, Respondent bears the burden of showing that the verdict in the murder case necessarily decided the issues present in the rape prosecution. See *Booker*, 540 S.W.2d at 93; *Tramunti*, 500 F.2d at 1346.

Applying the above stated principles to the instant case, we find that Respondent has carried his burden and that collateral estoppel precludes Respondent being charged with the aggravated forcible rape

**3.** See also *Coffey v. United States*, 116 U.S. 436, 442–43, 6 S.Ct. 437, 29 L.Ed. 684 (1886); *Frank v. Mangum*, 237 U.S. 309, 333–34, 35 S.Ct. 582, 59 L.Ed. 969 (1915); and *Sealfon v. United States*, 332 U.S. 575, 578, 68 S.Ct. 237, 92 L.Ed. 180 (1948).

**4.** " 'If a later court is permitted to state that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest, the possible multiplicity of prosecutions is staggering. * * * In fact, such a restrictive definition of "determined" amounts simply to a rejection of collateral estoppel, since it is impossible to imagine a statutory offense in which the government has to prove only one element or issue to sustain a conviction.' " *Ashe*, 397 U.S. at 444, 90 S.Ct. 1189, quoting Mayers & Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 Harv.L.Rev. 1, 38 (1960).

of Victim in 1991, for the following reasons.

In charging Respondent with the murder of Victim, the State, in its Notice of Intent to Seek the Death Penalty, alleged that Respondent had committed a felony in conjunction with the murder, to-wit: rape. The State's theory throughout trial was that Respondent killed Victim, because he raped her. The State in its opening and closing arguments asserted that Respondent abducted, held hostage, raped, killed and dumped Victim, all in one continuous span of events. It was a series of actions, each logically following the other, culminating in murder to silence Victim as to the multitude of atrocities committed upon her. Now, in arguing that it should be able to try the forcible rape case against Respondent, the State contends that it is possible that the jury found that Respondent beat Victim in the head with a blunt instrument, but maybe did not mean to kill her. This illogical argument flies in the face of the theory that the State relied upon throughout the murder trial, that the only reason Respondent allegedly killed Victim is *because* he raped her.

The 1991 Missouri Approved Instruction (MAI) 320.02.1A for the charge of aggravated rape defines the "serious physical injury" element of aggravated forcible rape as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." There exists no rational basis that a jury could conclude beyond a reasonable doubt that Respondent committed the violence constituting and contained within the definition of aggravated forcible rape, after the jury in the murder trial found that Respondent did not beyond a reasonable doubt commit the violence that resulted in the death of Victim.

Instruction No. 6 for first-degree murder, given to the jury in the murder trial stated:

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about January 7, 1991, in the County of Lincoln, State of Missouri, [Respondent] caused the death of [Victim] by striking her in the head with a blunt instrument, and

Second, that [Respondent] knew or was aware that his conduct was causing or was practically certain to cause the death of [Victim], and

Third, that [Respondent] did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, Then you will find [Respondent] guilty of murder in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find [Respondent] not guilty of murder in the first degree.

Instruction No. 7 for second-degree murder, given to the jury in the murder trial stated:

If you do not find [Respondent] guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree under this instruction.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about January 7, 1991, in the County of Lincoln, State of Missouri, [Respondent] caused the death of [Victim] by striking her in the head with a blunt instrument, and

Second, that [Respondent] knew or was aware that his conduct was causing or was practically certain to cause the death of [Victim], Then you will find

[Respondent] guilty of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find [Respondent] not guilty of murder in the second degree.

Instruction No. 8 for involuntary manslaughter, given to the jury in the murder trial stated:

If you do not find [Respondent] guilty of murder in the second degree, you must consider whether he is guilty of involuntary manslaughter under this instruction.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about January 7, 1991, in the County of Lincoln, State of Missouri, [Respondent] caused the death of [Victim] by striking her in the head with a blunt instrument, and

Second, that [Respondent] recklessly caused the death of [Victim], then you will find [Respondent] guilty of involuntary manslaughter.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find [Respondent] not guilty of involuntary manslaughter.

In determining whether [Respondent] recklessly caused the death of [Victim], you are instructed that a person acts recklessly as to causing the death of another person when there is a substantial and unjustifiable risk he will cause death and he consciously disregards that risk, and such disregard is a gross deviation from what a reasonable person would do in the circumstances.

The jury acquitted Respondent on all three of these charges.

Dr. Case's testimony via deposition was played to the jury in its entirety. Dr. Case opined that there was a sexual assault component to the crime, and that the lethal blow to the head and all other inflicted injuries occurred at or about the same time. The State's theory of its case against Respondent was that he killed Victim because he raped her. The motive for the murder was sexual assault. The State on several occasions sought to introduce evidence of the sexual assault against Victim to help prove its case for murder against Respondent. The State successfully introduced this evidence, even though there was no rape or sexual assault charge being prosecuted against Respondent in the trial. The only reason Respondent was arrested and charged for Victim's murder was because the DNA found in her underpants matched Respondent's DNA. There was no other direct evidence tying Respondent to the crimes against Victim. Furthermore, there was no testimony that Respondent was at the reception or anywhere in the area at the time of the crimes. No one, not even the families or friends of Victim and Respondent, had ever seen Respondent with Victim.

There was testimony from Victim's sister that Victim had dated an African–American male in the past, but hid it from her mother because she feared her mother would not accept such a relationship. Respondent's statements to his mother while he was incarcerated that he did have sex with Victim explains the presence of his semen on Victim's underwear. However, it does not necessarily implicate him in Victim's alleged sexual assault because the semen had degraded to such a degree to scientifically reveal the possibility that it had been deposited there some time before the crime took place.

The expert medical testimony presented at trial was that the DNA in the form of semen found on Victim's underpants, which matched Respondent's DNA, had

likely been there for at least 72 hours. This expert medical conclusion was based on the lack of sperm present in the semen sample, and other scientific indicia of degradation. Victim's body was found 36 hours after being seen alive at the Convenience Corner gas station. Hoey agreed that the conditions in which Victim's body was found, i.e., snow, ice and sub-freezing temperatures, would have stopped the sample from further degradation. Therefore, the jury could have believed, based on the evidence presented at trial, that the discovery of Respondent's DNA on Victim's underpants did not conclusively connect him to the murder of Victim.

The State argues that collateral estoppel does not preclude it from pursuing the aggravated forcible rape charge against Respondent because "a rational jury could have found that Respondent inflicted the violence upon [Victim] that resulted in her death, but in doing so lacked the requisite intent to be guilty of either first degree murder or its lesser included offenses." This argument runs counter to the State's contention at trial that the "rape was germane only to provide motive, identification, and intent on the part of [Respondent] as to the murder case." The State continues that since aggravated forcible rape does not contain an intent element, and since the jury *did not necessarily find* that Respondent did not commit the violence against Victim, the jury did not necessarily decide an ultimate fact in Respondent's favor that the State would have to prove in the aggravated forcible rape case.

■ We find that this is the precise kind of hypertechnical argument that *Ashe* says is not to be applied. *Ashe*, 397 U.S. at 443–44, 90 S.Ct. 1189. "Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" *Id.* at 444, 90 S.Ct. 1189, quoting Mayers & Yarbrough, *supra* n. 5, at 38–39.

The State would like us to accept the scenario, here illustrated in its practical light and without the use of the term *mens rea*, that it is possible that a jury could rationally find that Respondent viciously beat Victim, hit her in the head hard enough to cause internal bleeding, and left her nearly naked in a ditch on the side of the road in brutal winter weather, but did not mean to kill her, and was not even reckless in doing so, but that he did cause the same serious physical injury in pursuit of raping her. This is not a realistic and rational conclusion from the charges; theory of the case; testimony, both lay and expert; evidence; and instructions.

The State's technically restrictive *"mens rea"* argument simply amounts to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal. See *Ashe*, 397 U.S at 444, 90 S.Ct. 1189. Also, there was no theory, much less evidence, presented at trial that Respondent perpetrated the violence but was unaware of the reckless nature of his actions or the probable deadly consequences. Rather, the State's theory was that Respondent meant to kill Victim as it was a rape-homicide, i.e., the rape was the motive itself for the murder. The defense theory was that the State had the wrong defendant altogether, and Respondent had nothing to do with the crime. Therefore, for the jury to concoct a scenario of deadly physical violence by Respondent yet lack of intent to kill would not reasonably follow from the theories and

evidence presented at trial. To come to this conclusion would be irrational and unrealistic in light of the parties' hypotheses of what happened to Victim and the ultimate facts presented throughout the trial, from the charges to the cases in chief to the closing arguments to the instructions. Our inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings. *Seal-fon*, 332 U.S. at 579, 68 S.Ct. 237. As such, we reject the State's hypertechnical analysis and unrealistic assessment of the ultimate facts decided by the jury's verdict.

The U.S. Supreme Court's reasoning in *Ashe* is instructive. In *Ashe*, four men were charged with robbing six men playing a poker game, and stealing one of the poker player's car. *Id.* at 437, 90 S.Ct. 1189. The four men were subsequently charged with seven offenses, robbing each one of the six poker players and stealing the car. *Id.* at 438, 90 S.Ct. 1189. The defendant Ashe was acquitted by a jury of robbing one of the six men, in a general verdict. *Id.* at 439, 90 S.Ct. 1189. Thereafter he was charged and brought to trial for the robbery of another one of the six poker players. *Id.* He filed a motion to dismiss the charge, based on his previous acquittal. *Id.* The trial court denied the motion to dismiss and Ashe was subsequently convicted of robbing the second poker player. *Id.*

The case made its way up to the Supreme Court, by federal writ of habeas corpus, and the Court held that where the defendant was charged in separate counts with robbery of each of the six poker players and was tried on one count and was acquitted for insufficient evidence, where the identity of the defendant was

the single rationally conceivable issue in dispute, collateral estoppel precluded the subsequent prosecution of the defendant for the robbery of a different player. *Ashe*, 397 U.S. at 445–46, 90 S.Ct. 1189. In coming to this conclusion, the Court reasoned that "[s]traightforward application of the federal rule to the present case can lead to but one conclusion.... For the record is utterly devoid of any indication that the first jury could rationally have found that an armed robbery had not occurred, or that [first robbery victim] had not been a victim of that robbery." *Id.* at 444–45, 90 S.Ct. 1189. "The single rationally conceivable issue in dispute before the jury was whether the petitioner had been one of the robbers.... And the jury by its verdict found that he had not." *Id.* at 445, 90 S.Ct. 1189. "The federal rule of law, therefore, would make a second prosecution for the robbery of [the second robbery victim] wholly impermissible." *Id.*

Such is the issue in the instant case. There is no indication in the record that the jury could rationally have found that Victim was not assaulted and murdered. The single rationally conceivable issue before the jury was the identity of the perpetrator. And the jury found that the perpetrator was not Respondent. This conclusion is further bolstered by the substantial evidence of third-party guilt presented by Respondent in the murder case.

For the foregoing reasons, the State's Point on Appeal is denied.

## Conclusion

We hold that the trial court correctly applied the principles of collateral estoppel in granting, with prejudice, Respondent's motion to dismiss the charge of aggravated forcible rape. The judgment of the trial

court is affirmed.[5]

ROBERT G. DOWD, JR. and PATRICIA L. COHEN, JJ., concur.

**5.** Respondent's Motion to Strike Exhibits is denied.