

# In the Missouri Court of Appeals
## Eastern District

### DIVISION TWO

| | | |
|---|---|---|
| JEFFREY J. DELEON, | ) | No. ED111372 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| v. | ) | Cause No. 20SL-CC05258 |
| | ) | |
| STATE OF MISSOURI, | ) | Honorable William M. Corrigan, Jr. |
| | ) | |
| Respondent. | ) | Filed: May 7, 2024 |

### Introduction

Jeffrey DeLeon ("Appellant") appeals the motion court's judgment denying his amended Rule 29.15 motion for post-conviction relief following an evidentiary hearing.[1] In his first point on appeal, Appellant argues that the motion court erred in denying his amended motion because trial counsel was ineffective for failing to consult with, retain, and call an independent DNA expert. In his second point on appeal, Appellant argues that the motion court erred because trial counsel was ineffective for failing to consult with, retain, and call an independent pharmacological expert. We affirm the judgment of the motion court.

---

[1] All Rule references are to the Missouri Supreme Court Rules (2023) unless otherwise indicated.

**Factual and Procedural Background[2]**

The State charged Appellant with first-degree sodomy pursuant to Section 566.062 RSMo.[3] Following a jury trial on November 5-7, 2018, Appellant was convicted of attempted first-degree sodomy. After Appellant waived jury sentencing, the court sentenced him to fifteen years' imprisonment. Appellant's conviction was affirmed on direct appeal by per curiam order and memorandum. The evidence at trial was as follows.

During the evening and night of December 12-13, 2015, Victim visited a friend at her apartment complex, with plans to spend the night. Victim, her friend, her friend's neighbors, and her friend's neighbor's friends—including Appellant—drank and socialized together in the apartment courtyard. Victim and Appellant met one another for the first time at this gathering. Victim, who normally took the medication "Paxil," skipped her dosage to avoid the medication negatively reacting with any alcohol she would consume. There was no evidence that Victim had ever experienced psychiatric side-effects from Paxil, and Victim testified that she "remembered everything that happened that night."

Victim slept in her friend's bedroom. Victim awoke when she "felt someone's head between [her] legs," "with his mouth on [her] lips," which she clarified to mean the skin of her vagina. While Victim had gone to bed fully clothed, she realized "that [Appellant] had taken [her] pants and [her] panties [off]." Victim first assumed that Appellant was her boyfriend, before touching Appellant's head and realizing that he was "almost bald," in contrast to her boyfriend, who "wore his hair military cut" with "spikes." Victim then screamed to turn on the lights and for Appellant to stop. Appellant turned on the lights, and Victim accused him of raping her. Appellant

---

[2] The facts are viewed in the light most favorable to the verdict and judgment. *Ervin v. State*, 80 S.W.3d 817, 820 n.1 (Mo. banc 2002).
[3] All statutory references are to RSMo. (cum. supp. 2015), unless otherwise indicated.

apologized and fled the apartment, leaving his hat behind in the bed. Victim had recognized Appellant from the gathering a few hours earlier.

Immediately after Appellant fled the apartment, Victim ran into her friend's son's bedroom and told him to go get his mother, because she had "just been raped." Victim was "wrapped up in something that [she] had grabbed from [her friend's] closet."

Victim called the police and her boyfriend, got dressed, and then ran from the apartment complex down the hill to the end of the road to wait for the police. Victim's boyfriend testified that Victim was hysterical while she recounted to him over the phone that she "woke up with someone between her legs."

The police arrived at 2:58 a.m., within 10 minutes of Victim's call. Victim was screaming and crying while waving the officers down. Victim told one of the officers that she "had woken up to the feeling of someone performing oral sex between her legs." The officer remarked that, although Victim smelled of alcohol, she was coherent and steady on her feet. The officers drove Victim back towards the apartment building. An officer testified that, as they approached the building, he saw Appellant in the street behind the apartment building and noticed that Appellant's shorts were unzipped. Upon seeing Appellant, Victim immediately began yelling at him, accusing him of raping her. Victim was taken to a hospital, where a Sexual Assault Nurse Examiner performed an examination.

Appellant waived his *Miranda* rights and gave a written and oral statement to the police, denying his presence in the bed and bedroom where Victim had slept. Appellant provided multiple inconsistent and conflicting stories to explain his presence in the apartment. For example, Appellant first specifically denied that he had been wearing a hat and that he had been in the bedroom. Appellant then said that he had been wearing a hat, but that he had taken it off in his car.

3

He then stated that he had taken it off when he went to sleep on the couch in Victim's friend's apartment. Appellant did not provide an explanation as to why his hat was found in Victim's bed. Further, Appellant had claimed that he left Victim's friend's apartment between 10:30 and 11:00 p.m., after spending "two minutes" there, to go to his girlfriend's house in Fenton, fifteen minutes away, only to return to Victim's friend's apartment upon finding his girlfriend's house locked. Appellant later changed his story, claiming to have left the apartment for his girlfriend's house at 1:30 or 2:00 a.m.

DNA analysis confirmed the presence of Appellant's DNA on the hat found in the bed where Victim had slept and on the waistband of Victim's underwear. Victim's external vaginal swab detected a low amount of male DNA, but the concentration was insufficient to permit a comparison test. The male DNA was from neither semen nor sperm cells.

During closing argument, the prosecutor reminded the jury that Victim was visibly in distress on the stand when testifying three years after the night in question. Appellant did not put on any evidence in his defense.

After his conviction, Appellant timely filed a pro se Rule 29.15 motion on October 20, 2020 and an amended motion on December 24, 2021. On July 29, 2022, the motion court conducted an evidentiary hearing, which was later supplemented with Appellant's deposition taken on September 13, 2022. In addition to his own testimony and that of his trial counsel, Appellant introduced expert testimony from a DNA expert and a pharmacological expert. As detailed more thoroughly below, the DNA expert explained the theory of "secondary touch DNA transfer," and the pharmacological expert explained that a small fraction of Paxil takers can experience psychological side-effects.

The motion court entered its findings of fact, conclusions of law, and order and judgment on December 6, 2022, finding that trial counsel was not ineffective because trial counsel's decision not to consult with, retain, and call independent DNA and pharmacological experts was a reasonable trial strategy; likewise, the motion court found that Appellant suffered no prejudice from his trial counsel's alleged deficiency in representation.

This appeal follows.

**Standard of Review**

Appellate review of a judgment denying a Rule 29.15 motion for post-conviction relief is limited to whether the motion court's findings of fact and conclusions of law are clearly erroneous. *Shockley v. State*, 579 S.W.3d 881, 892 (Mo. banc 2019); Rule 29.15(k). The motion court's findings and conclusions are clearly erroneous only if a full review of the record leaves the reviewing court with "the definite and firm impression that a mistake has been made." *Moore v. State*, 458 S.W.3d 822, 829 (Mo. banc 2015). The motion court is "entitled to believe all, part, or none of the evidence presented at the post-conviction hearing." *State v. Hunter*, 840 S.W.2d 850, 863 (Mo. banc 1992). The findings are presumed correct. *McLaughlin v. State,* 378 S.W.3d 328, 336–37 (Mo. banc 2012). "We view the record in the light most favorable to the motion court's judgment, accepting as true all evidence and inferences that support the judgment and disregarding evidence and inferences that are contrary to the judgment." *Oliphant v. State*, 525 S.W.3d 572, 577 (Mo. App. S.D. 2017); *see also State v. Gilbert*, 103 S.W.3d 743, 748 (Mo. banc 2003). A movant has the burden to show by a preponderance of the evidence that the motion court clearly erred in its ruling. *Roberts v. State,* 276 S.W.3d 833, 835 (Mo. banc 2009). "[A] trial court judgment will be affirmed if cognizable under any theory, regardless of whether the reasons

advanced by the trial court are wrong or not sufficient." *Driskill v. State*, 626 S.W.3d 212, 224 n.6 (Mo. banc 2021) (quoting *Hosier v. State*, 593 S.W.3d 75, 83 n.2 (Mo. banc 2019)).

**Discussion**

To succeed on a claim of ineffective assistance of counsel, a movant must show, by a preponderance of the evidence, facts, not mere conclusions, demonstrating: (1) counsel failed to conform to the degree of skill, care, and diligence of a reasonably competent attorney under similar circumstances, and (2) counsel's deficient performance prejudiced the movant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *McLaughlin*, 378 S.W.3d at 337. If a movant fails to satisfy either element of the test, they are not entitled to relief. *Creighton v. State*, 520 S.W.3d 416, 422 (Mo. banc 2017).

"A movant must overcome the strong presumption that trial counsel's conduct was reasonable and effective." *Hosier,* 593 S.W.3d at 81 (citing *Davis v. State*, 486 S.W.3d 898, 906 (Mo. banc 2016)) (internal quotations omitted). "To overcome this presumption, a movant must identify specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." *Id*. "Reasonable choices of trial strategy, no matter how ill-fated they appear in hindsight, cannot serve as a basis for a claim of ineffective assistance." *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Oplinger v. State*, 350 S.W.3d 474, 477 (Mo. App. S.D. 2011) (quoting *Strickland*, 466 U.S. at 689).

"Prejudice occurs when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hosier*, 593 S.W.3d

at 81 (quoting *Davis*, 486 S.W.3d at 906). A "reasonable probability" is a probability sufficient to undermine confidence in the trial's outcome. *Deck v. State*, 381 S.W.3d 339, 343 (Mo. banc 2012) (citing *Strickland*, 466 U.S. at 687). Although it is insufficient for a movant to show only that the alleged error had some conceivable effect on the outcome of the proceeding, a movant is not required to show that the alleged error "more likely than not altered the outcome of the case." *Cravens v. State*, 50 S.W.3d 290, 294 (Mo. App. S.D. 2001) (quoting *Strickland*, 466 U.S. at 693). "The *Strickland* test falls somewhere between these two extremes, and the issue becomes what effect the evidence would have had if it had been before the jury." *Id.* (citing *Trimble v. State*, 693 S.W.2d 267, 274 (Mo. App. W.D. 1985)). If a movant's guilt is established by overwhelming evidence, *Strickland* prejudice typically cannot be established. *See Marshall v. State*, 567 S.W.3d 283, 295 (Mo. App. E.D. 2019) (citing *Taylor v. State*, 382 S.W.3d 78, 81-82 (Mo. banc 2012)).

"To prevail on a claim of ineffective assistance of counsel for failure to call a witness, the [movant] must show: "(1) counsel knew or should have known of the existence of a witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense."[4] *McFadden v. State*, 553 S.W.3d 289, 305 (Mo. banc 2018) (quoting *Deck*, 381 S.W.3d at 346). "Because selection of witnesses is presumptively a choice of strategy, it typically cannot form the basis of an ineffective assistance of counsel claim." *Driskill*, 626 S.W.3d at 229. "A trial strategy decision may only serve as a basis for ineffective assistance of counsel if the decision is unreasonable." *Id.* (quoting *McLaughlin*, 378 S.W.3d at 337). The question here is not "whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision was reasonable under all the circumstances." *Id.* (quoting *Johnson v. State*, 406 S.W.3d 892, 901 (Mo. banc 2013)).

---

[4] The legal standard for a claim of failure to call a witness applies equally to a claim of failure to call an *expert* witness. *See McDaniel v. State*, 460 S.W.3d 18 (Mo. App. E.D. 2014), *transfer denied* (April 28, 2015).

<u>Point I: Failure to Consult, Retain, and Call Independent DNA Expert Witness</u>

Appellant argues that the circuit court clearly erred in finding that trial counsel was not ineffective for failing to consult with, retain, and call an independent DNA expert witness because trial counsel acted unreasonably in failing to rebut the State's DNA evidence; Appellant contends that this alleged unreasonable failure prejudiced him because, otherwise, there was a reasonable probability that the jury would not have found him guilty of either sodomy or attempted sodomy.

The motion court found both that trial counsel had not acted unreasonably and that trial counsel's alleged failure would not have prejudiced Appellant. However, we need not analyze the motion court's conclusion as to whether trial counsel conformed to the degree of skill, care, and diligence of a reasonably competent attorney under similar circumstances, because trial counsel's alleged unreasonable failures here, even if substantiated, would not have prejudiced Appellant. *See Michael v. State*, 348 S.W.3d 164, 167 (Mo. App. E.D. 2011) ("If it is simpler to dispose of a claim of ineffectiveness on the ground of lack of sufficient prejudice, that course should be followed.") (citing *Sidebottom v. State*, 781 S.W.2d 791, 796 (Mo. banc 1989)).

Appellant claims that he was prejudiced by trial counsel's conduct because, if trial counsel had consulted with, retained, or called an independent DNA expert witness, trial counsel would have been able to better inform the jury about the theory of "secondary touch DNA transfer," which occurs when DNA is transferred from one person to another person or object by virtue of an intermediate object or person. Specifically, Appellant concludes that the secondary touch transfer theory could explain his DNA appearing on Victim's underwear without him having touched it. Once introduced to the jury, Appellant maintains that this secondary touch transfer theory would have presented a reasonable basis for the jury to have acquitted him of all charges.

However, Appellant's theory of prejudice fails in light of the conjectural nature of his secondary touch transfer theory and the overwhelming evidence of his guilt.

First, we find that Appellant's argument that the independent DNA expert would have presented the jury with an alternative, innocuous explanation for the presence of his DNA on Victim's underwear waistband is unsupported by the evidence. The secondary touch transfer theory provides only a mechanism to explain how Appellant's DNA could have been found on Victim's underwear. However, to be applicable, that theoretical mechanism requires facts establishing or tending to establish that Appellant had transferred his DNA to an intermediate object or person which Victim then touched—transferring Appellant's DNA to herself—before touching the waistband of her underwear and transferring Appellant's DNA there. While Appellant testified that he shook hands with Victim and patted her shoulder, we infer from the motion court's judgment that it did not find him credible. *Oliphant*, 525 S.W.3d at 577. This court does not review a motion court's Rule 29.15 judgment objectively; instead, "[w]e view the record in the light most favorable to the motion court's judgment, accepting as true all evidence and inferences that support the judgment…" *Id*. We review instead for clear error. *Shockley*, 579 S.W.3d at 892.

Because there is no factual basis for the application of the secondary touch transfer theory, there would have been no reasonable likelihood of a different outcome were it not for trial counsel's alleged unreasonable failure to consult with, retain, and call an independent DNA expert.

Second, even assuming, *arguendo*, that there was a factual basis supporting the application of secondary touch transfer theory, Appellant would be unable to establish prejudice in light of the overwhelming evidence of his guilt. Appellant relies on *State v. Barton*, 936 S.W.2d 781 (Mo. banc 1996), *Moore v. State*, 827 S.W.2d 213 (Mo. banc 1992), and *State v. Cravens*, 50 S.W.3d 290 (Mo. App. S.D. 2001) to argue that trial counsel's alleged unreasonable failure prejudiced

him. These three cases are easily distinguishable from the case now before us and do not support the conclusion that the motion court clearly erred in finding no prejudice.

*Barton* is legally and factually distinguishable from the case at bar. The Supreme Court in *Barton* was asked to decide both a direct appeal and a Rule 29.15 motion. The Court reversed on the direct appeal claim, holding that the Rule 29.15 claim was therefore mooted. The *Barton* appellant argued that the circuit court had erred in sustaining the prosecutor's objection to his closing argument, asserting that his closing argument was proper because it was supported by evidence on the record and reasonable inferences therefrom. The Court applied the "abuse of discretion" standard of review—a more exacting standard of review than the highly deferential "clear error" standard of review that we apply to Rule 29.15 ineffective assistance of counsel claims. *See Phillips v. State*, 679 S.W.3d 43, 47 (Mo. App. E.D. 2023) *transfer denied* (Dec. 19, 2023) ("Because the abuse of discretion standard applied in [*State v. Thompson*, 68 S.W.3d 393, 395 (Mo. banc 2002)] is less stringent than the standard for *Strickland* prejudice, Phillips's argument that *Thompson* is 'controlling precedent' is without merit.") (citing *Deck*, 68 S.W.3d at 427 n.5 ("The standard for finding prejudice in the context of preserved error is lower than the standard for finding error under *Strickland*…")). The lower standard of review applied to the circuit court's finding of prejudice in *Barton* undercuts the case's precedential value as applied to the case at bar.

Further, under the specific facts in *Barton*, a finding of prejudice from the circuit court's error was unavoidable because of the strength of the conclusion that a reasonable probability existed that the jury would have reached a different result were it not for the error. Specifically, defense counsel had first pointed out that the murder victim's granddaughter had credibly testified to speaking with the victim over the phone from exactly 3:00 to 3:25. In closing argument, trial

counsel inferred the objected-to-conclusion that the granddaughter's allegation clearly undermined the State's assertion that the appellant had already killed the victim by 3:15. The Court explained how the circuit court prejudiced the defendant by foreclosing defense counsel's argument:

> This conclusion is especially important to [the appellant]. It necessarily places him at the crime scene only around 3:00, when he answered the phone call, with the murder occurring no earlier than 3:25, after [the granddaughter] hung up the phone with [the victim]. This would leave [the appellant] with little or no time to dole out five blunt-force injuries to the victim's scalp; four blunt-force injuries to the face; thirty-eight stab wounds to the torso; and several slashes to the face and neck; sexually assault the victim; clean himself up; dispose of the murder weapon; and still walk back to [the trailer of another of the prosecution's witnesses] by around 3:30.

*Barton*, 936 S.W.2d at 786. The Court later went on to buffer its conclusion of prejudice by explaining that the evidence foreclosed a finding of "overwhelming guilt," citing several alternative innocuous explanations for the facts that the prosecution had used to infer the appellant's guilt. Importantly, in *Barton*, there was no direct evidence tending to establish the appellant's guilt; in contrast, the case here presented direct evidence of Appellant's guilt in the form of Victim's testimony.

*Moore* is likewise factually distinguishable. Although, as with the case at bar, the Court was therein presented with an ineffective assistance of counsel claim arising from a sodomy conviction, the facts of *Moore* more strongly suggested prejudice than the facts of Appellant's case. In *Moore*, the victim was sodomized by a masked assailant. The victim saw a part of the assailant's face when she attempted to raise his mask before falling unconscious. The assailant spoke a few words to her during the assault. While the victim was unable to identify the assailant during the attack, she later identified him by voice recognition. As found by the motion court, the appellant, maintaining his innocence, had repeatedly requested for his defense attorney to secure a forensic serological analysis. The serological evidence would have conclusively established that

11

the appellant "could not have been the source of the semen found on the sheet [of the victim's bed]." *Moore*, 827 S.W.2d at 215. Forensic samples taken from the victim were inconclusive because they had degraded since the commission of the offense. In concluding that, had trial counsel not unreasonably failed to obtain a serological analysis, there was a reasonable probability of a different result, the Court emphasized the brevity of the victim's view of her assailant's countenance in a darkened room, the incongruity of her testimony as to her assailant's voice, the appellant's consistent denial that he was the perpetrator, and his consistent requests that his attorney make use of forensic testing to corroborate his innocence. *Id.* at 216. Like in *Barton*, there was no direct evidence tending to establish the appellant's guilt, and the circumstantial evidence upon which the conviction relied was insufficient to establish the appellant's overwhelming guilt. *See, e.g., Marshall*, 567 S.W.3d at 295.

Unlike the case at bar, there are not only no facts allowing for the application of the secondary touch transfer theory, but each of the facts of record also tends to discredit the conclusion that Appellant would have us draw from his contention that he did not remove Victim's underwear. First, Victim directly testified, in detail, to Appellant himself having sodomized her, stating that she saw Appellant in the room with her when he turned on the lights, and that he apologized to her after she accused him of "raping" her. Further, Appellant's hat, with his DNA on it, was found in her bed, and the police observed Appellant, with his pants unzipped, in the street behind the apartment building during the night in question. Victim's credibility was bolstered by testimony from the responding police officers, by testimony from her boyfriend, by her demeanor on the stand, and by the results of her sexual assault analyses—which, while of an insufficient sample size to permit a comparison with Appellant's DNA, tended to corroborate her story by showing that a male had recently deposited his DNA in or on her vagina.

12

Again, unlike here, in *Cravens*, there was no direct evidence. In *Cravens*, the Southern District found that the appellant was prejudiced by his trial counsel's shortcomings because, had trial counsel acted reasonably, there was a reasonable probability of a different outcome—stated conversely, the evidence was insufficient to establish the appellant's overwhelming guilt. Again, unlike here, in *Cravens*, there was no direct evidence. The appellant was charged with second-degree murder for shooting and killing a victim with a shotgun at a distance of six to eight feet. The court found that the appellant's attorney had acted unreasonably in failing to call an independent expert to testify that the shotgun had instead been fired from a distance no greater than four inches from the victim's face, challenging the conclusion of the prosecution's expert. The evidence supporting the conviction was: (1) the appellant and the victim had been arguing throughout the day; (2) the appellant threatened the victim and struck her earlier that day; (3) shortly before the shot was fired, the victim was heard screaming, "No. No. Don't."; (4) the appellant claimed that, upon entering the trailer, the victim had the gun underneath her chin, and the appellant thought she was going to kill herself; and (5) the appellant claimed that he reached for the gun and struggled with the victim to get it away from her, and that the gun "went off." *Cravens*, 50 S.W.3d at 296. The appellant's claim that the gun had fired accidentally—inconsistent with the *mens rea* for second-degree murder—was undermined by the conclusion of the prosecution's expert that the gun had been fired from a distance of six to eight feet from the victim's head.

While the factual differences between *Cravens* and the case at bar are many, the most important distinction is that the evidence in *Cravens* was circumstantial and not inconsistent with the appellant's innocence. *See id.* at 297 ("The jury might have inferred that the argument was nothing more than an everyday occurrence and not a prelude to a violent attack in light of the fact

that certain prosecution witnesses testified that Movant and the victim argued 'every day' or that the arguing was a 'common' occurrence.").

Unlike *Barton, Moore,* and *Cravens*, for a different result to have been obtained in the case at bar, the jury would not only have needed to believe the secondary touch transfer theory—and found sufficient facts for its application—but they would also have needed to disbelieve the remainder of the evidence tending to establish Appellant's guilt.

We recognize that the jury's verdict convicting Appellant of attempted sodomy, but failing to find him guilty of sodomy itself,[5] presents a curious situation in light of the strength of the facts supporting his conviction of sodomy. However, our courts have long recognized that "[j]uries frequently convict on some counts and acquit on others not because they are unconvinced of guilt but simply because of compassion and compromise." *State v. Mellott*, 733 S.W.2d 814, 816 (Mo. App. W.D. 1987) (internal citations omitted) (finding inconsistent verdicts may reflect a jury's desire to reduce punishment for a crime).[6] Likewise, in the context of collateral estoppel actions, we have consistently cautioned that "it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case." *Cusumano v. State*, 495 S.W.3d 231, 239 (Mo. App. E.D. 2016) (quoting *State v. Dowell*, 311 S.W.3d 832, 837 (Mo. App. E.D. 2010)). The

---

[5] Pursuant to Jury Instruction No. 6, modeled after MAI-CR3d 304.07, the jury was instructed to consider whether Appellant was guilty of attempted sodomy in the first degree if they "do not find the defendant guilty of sodomy in the first degree." While the instruction on first-degree sodomy, modeled after MAI-CR3d 320.60, purported that "unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, *you must find the defendant not guilty of that offense*," (emphasis added) the jury was not required to, and did not, acquit Appellant of first-degree sodomy. First, "Missouri's instructions on lesser-included offenses do not require that the defendant first be acquitted of the greater offense before the jury can consider the lesser offense." *Cusumano v. State*, 495 S.W.3d 231, 239 (Mo. App. E.D. 2016) (quoting *Tisius v. State*, 183 S.W.3d 207, 217 (Mo. banc 2006) (internal quotations omitted)). Second, the jury did not return a verdict of not guilty for first-degree sodomy. "A jury acquits a defendant of a charge when it returns a verdict of not guilty." *State v. Cusumano*, 339 S.W.3d 909, 915 (Mo. App. E.D. 2013). "Missouri law requires the jury's verdict to be unanimous, in writing, signed by the foreperson, and returned in open court." *Id.* at n.5 (citing Rule 29.01(a)). With respect to the greater offense of sodomy, the jury did not do so here.

[6] While sodomy in the first degree and attempted sodomy in the first degree are both governed by § 566.060, there is nothing in the record to suggest that the jury was aware that Appellant's punishment could be the same whether they convicted him of the greater offense or the lesser offense.

same concerns apply here. "This [C]ourt will not second-guess whom the jury chooses to believe, as we leave issues of credibility and the weight to be afforded conflicting evidence to the jury." *State v. White*, 247 S.W.3d 557, 563 (Mo. App. E.D. 2007).

In light of the overwhelming evidence of Appellant's guilt, Appellant failed to establish that the motion court clearly erred in finding that he did not suffer prejudice from trial counsel's alleged unreasonable failure.

Point I is denied.

<u>Point II: Failure to Consult, Retain, and Call Independent Pharmacological Expert Witness</u>

Appellant next argues that the motion court clearly erred in finding that trial counsel was not ineffective for failing to consult with, retain, and call an independent pharmacological expert. Appellant maintains that trial counsel's alleged unreasonable failure prejudiced him because an independent pharmacological expert would have provided him with a viable defense for sodomy and attempted sodomy by casting doubt on Victim's testimony. Specifically, Appellant claims that, because the pharmacological expert established during the evidentiary hearing that some people taking Paxil may suffer from hallucinations, abnormal dreams, and impaired memory, and that these effects can be magnified when drinking alcohol—even when "skipping a dose"—this expert testimony would have undermined Victim's credibility in the eyes of the jury such that it was reasonably probable that they would have acquitted Appellant of all charges.

Appellant maintains that trial counsel's decision not to call an independent pharmacological expert was unreasonable because reasonable trial counsel would have called an expert "to properly introduce testimony about what can happen when alcohol and Paxil are mixed together..." Appellant argues that, "if Appellant's expert had testified, he would have been able to provide expert opinion that, even if [Victim] had skipped her dose that night, enough Paxil would

15

have remained in her system that she could have been experiencing ill effects such as hallucinations, abnormal dreams, impaired memory, altered memories, amnesia, and a 'drugged feeling.'" Appellant asserts prejudice from counsel's alleged unreasonable failure having deprived him of an avenue to challenge Victim's credibility. He argues that if the expert witness had testified, there is a reasonable probability that the jury would have disbelieved Victim and acquitted Appellant.

The motion court did not clearly err in denying Appellant relief on this point because Appellant's proposed expert would not have provided a viable defense, and Appellant failed to establish a reasonable probability of a different result.

First, Appellant's proposed pharmacological expert's testimony was too speculative to have produced a viable defense. As emphasized in the motion court's findings, the pharmacological expert established only that 0.1-1% of patients experience hallucinations from Paxil. The expert witness admitted that he knew of no evidence that would tend to indicate that Victim's memory or perception of reality was ever impacted by her taking Paxil, nor is there any evidence of record tending to suggest such an interaction. Given the low likelihood of the aforementioned negative side-effects, the dearth of evidence tending to suggest that Victim had ever suffered from such side-effects, and Victim's testimony that she clearly remembered the events of the night, Appellant's expert would not have produced a viable defense.

Second, Appellant failed to establish *Strickland* prejudice because, even if the jury had believed the expert's testimony, there is no reasonable probability of a different result. If there had been a sufficient factual basis for the jury to have believed that Victim's memory and perception of reality had been impacted by her taking Paxil and consuming alcohol, the proposed expert's testimony would—if at all—have had little effect on the jury's view of Victim's credibility because

16

Victim's rendition of her assault was corroborated by other evidence. *See, e.g., Marshall*, 567 S.W.3d at 295 (citing *State v. Collins*, 150 S.W.3d 340, 354-55 (Mo. App. S.D. 2004)). For example, Victim's testimony was consistent with the presence of Appellant's hat in the bed, the evidence of male DNA found in her external vaginal swabs, and Appellant's presence at the scene when the police arrived. Given the weakness of the theoretical probative value of the proposed expert witness's testimony, there is not a reasonable probability of a different outcome.

Because Appellant failed to establish both that his proposed pharmacological expert would have produced a viable defense and that such a defense would have created a reasonable probability of a different result, the motion court did not clearly err in finding that trial counsel was not ineffective.

Point II is denied.

### Conclusion

For the reasons set forth above, the judgment of the motion court is affirmed.

_____
Renée D. Hardin-Tammons, J.

Michael E. Gardner, J., concurs
Kurt S. Odenwald, P.J., dissents in a separate opinion



# In the Missouri Court of Appeals
# Eastern District

| | | | |
|---|---|---|---|
| JEFFREY J. DELEON, | ) | No. ED111372 | |
| | ) | | |
| Appellant, | ) | Appeal from the Circuit Court | |
| | ) | of St. Louis County | |
| vs. | ) | | |
| | ) | Honorable William M. Corrigan, Jr. | |
| STATE OF MISSOURI, | ) | | |
| | ) | | |
| Respondent. | ) | FILED: May 7, 2024 | |

Dissent

I dissent. The majority opinion affirms the motion court's judgment denying Jeffrey J. DeLeon ("DeLeon") his Rule 29.15[1] amended motion holding that DeLeon suffered no Strickland[2] prejudice, assuming arguendo, Trial Counsel rendered ineffective assistance in his representation of DeLeon. I disagree with the majority's conclusion that DeLeon was not prejudiced by Trial Counsel's failure to consult, retain, and/or call a DNA expert with regard to the presence of DeLeon's DNA on Victim's underwear. Given the particular facts presented in this appeal, the record compels a finding that Trial Counsel was ineffective for not investigating the State's DNA evidence through consulting an expert. Similarly, I would find that it was unreasonable trial strategy for Trial Counsel not to at least conduct a preliminary inquiry or

---

[1] All Rule references are to Mo. R. Crim. P. (2020), unless otherwise indicated.
[2] Strickland v. Washington, 466 U.S. 668 (1984).

investigation into evidence relating to the presence of DeLeon's DNA on Victim's underwear and consider available defenses to both the charged and lesser-included sexual offense. I am equally persuaded that Trial Counsel's failure to conduct a preliminary inquiry and investigation prejudiced DeLeon because such an inquiry reasonably would have introduced Trial Counsel to the theory of secondary transfer of DNA. Having knowledge of the science relating to secondary transfer of DNA would have permitted Trial Counsel to strategize and consider whether DeLeon's defense to the charge of attempted sodomy would benefit by providing the jury with a reasonable alternative explanation for the presence of DeLeon's DNA on Victim's underwear. Had the jury been presented with evidence regarding secondary transfer of DeLeon's DNA to Victim's underwear, and found such evidence credible, then there is a reasonable probability that the outcome of the proceeding would have been different. For that reason, I would reverse the motion court's judgment and remand the cause for a new trial.

Factual and Procedural History

The majority opinion does not analyze the issue of whether Trial Counsel conformed to the degree of skill, care, and diligence of a reasonably competent attorney in similar circumstances and fast-forwards to the issue of prejudice. I agree with the majority that "[i]f it is simpler to dispose of a claim of ineffectiveness on the ground of lack of sufficient prejudice, that course should be followed." Michael v. State, 348 S.W. 3d 164, 167 (Mo. App. E.D. 2011) (citing Sidebottom v. State, 781 S.W.2d 791, 796 (Mo. banc 1989)). The majority's approach was appropriate given its holding. However, because I diverge with my colleagues on the issue of prejudice, I must first address the facts underlying the motion court's finding that Trial Counsel was not ineffective is his representation of DeLeon.

This post-conviction appeal arises out of an incident occurring on or about December 13, 2015. Victim visited Friend's apartment complex and was drinking with Friend and Friend's

2

neighbors in the complex's courtyard. DeLeon was visiting friends who lived in the unit next door to Friend and was also socializing in the courtyard. Victim stayed at Friend's apartment that night. Victim testified that, after calling her Boyfriend, she went to sleep alone in Friend's bed, fully clothed. Victim testified that she later awoke to being sexually assaulted by DeLeon. Victim stated her pants and underwear had been removed and were on the floor, and a man was placing his mouth on her vagina. Initially believing Boyfriend had come to see her, Victim did not push him away for two to five minutes. When she placed her hands on his head, Victim realized the man had a different hairstyle than her boyfriend. She screamed, ran out of the room, and called the police and Boyfriend. Victim recognized DeLeon from earlier in the evening in the apartment courtyard. Both Boyfriend and the responding police officer found Victim was crying and upset after the incident. Police encountered DeLeon on a street behind the apartment complex sometime after the incident and noted his shorts were unzipped. DeLeon denied to police ever going into the bedroom of Friend's apartment or having any sexual contact with Victim.

The State charged DeLeon with one count of sodomy in the first degree for knowingly having deviate sexual intercourse with Victim, who lacked the capacity to consent. The case proceeded to a jury trial. The State's expert, K.M., a forensic scientist from the St. Louis County Police Department Crime Lab, conducted DNA analysis for the investigation and testified at trial. DeLeon provided a buccal swab, which K.M. used as a reference sample for his DNA profile. K.M. testified she positively matched DeLeon's DNA to samples found on two garments recovered from the scene: (1) the exterior waistband of Victim's underwear and (2) a hat, specifically a blue baseball cap that the State recovered from the bed in Friend's bedroom. K.M. testified that the DNA sample from the waistband of Victim's underwear was

3

approximately 110 quintillion times more likely to have originated from Victim and DeLeon than from Victim and an unknown individual. K.M. testified she also detected male DNA on Victim's vaginal swabs, but the sample was too small to do a comparison that could identify an individual contributor.

During cross-examination of K.M., Trial Counsel elicited testimony that DNA can be transferred through direct touch, such as shaking hands or touching someone's sleeve. Trial Counsel asked K.M. about whether a moist or sweaty handshake is more likely to transfer DNA, and K.M. answered that it depends on several factors, including whether the individual is a "shedder," who leaves behind more DNA than other people. Trial Counsel questioned K.M. about whether the amount of DNA transferred to another person or object is impacted by the type and duration of contact, such as moisture produced during several minutes of oral sex. K.M. responded noncommittally but stated that typically the longer an item is handled the more DNA is likely to be left behind. Trial Counsel did not elicit testimony about whether an individual's DNA can transfer to a person or item without directly touching that person or item.

A police officer testified that DeLeon first denied wearing a hat, then stated he wore a hat, but he took it off in the car, and finally stated he took off a hat when he went to sleep on Friend's couch. DeLeon did not take the stand or present evidence in his defense.

In addition to instructing the jury on first-degree sodomy, the trial court, over DeLeon's objection, instructed the jury on attempted first-degree sodomy. The State's proffered foundation for the attempt instruction was DeLeon's removal of Victim's underwear. The State argued that the removal of Victim's underwear was a substantial step toward the commission of

4

sodomy.[3]  The State argued in closing that the jury did not have to reach attempted sodomy because the evidence showed DeLeon was guilty of sodomy in the first degree.  The State further argued it did not need DNA to prove its case, given Victim's testimony and the circumstantial evidence.  But the State then emphasized "that [DeLeon's] DNA is on the waistband of [Victim's] underwear, exactly where you would grab if you're pulling someone's underwear down."

In closing argument, Trial Counsel aggressively focused on the absence of DeLeon's DNA on the swabs taken from Victim's vaginal area as evidence that oral sex did not occur.  Trial Counsel argued that the lack of DeLeon's DNA on Victim's vaginal area showed the State failed to meet its burden to prove sexual contact occurred between DeLeon and Victim.  Acknowledging DeLeon's DNA was found on the hat and underwear, Trial Counsel maintained that such evidence showed only Victim and DeLeon had been in the same room together:

> Was he in the room?  Was he in the bedroom?  Absolutely.  Was he in the room with [Victim]?  I'd be a fool to say he wasn't.  Of course he was there.  What they were doing—were they fooling around?  Was something going on?  Yeah.  It was clear there was DNA on the underwear track.  We know that.  And his hat's in there.

Trial Counsel also reiterated his opening statement observation that Victim's DNA was not found in DeLeon's mouth or found on the sheets and pillowcases.  Trial Counsel argued in summary: "[t]here are too many holes in this case, and they're DNA holes" and "[t]he DNA does not prove that [DeLeon placed his mouth on Victim's genitals]."  Regarding attempted sodomy, Trial Counsel argued there was no evidence that DeLeon was the one who pulled Victim's underwear down, that DeLeon expressed sexual interest in Victim prior to the incident, or that DeLeon intended to engage in oral sex with Victim.  Trial Counsel stated that even if the jury

---

[3] DeLeon objected on the grounds that the evidence did not support finding that the removal of Victim's underwear was a substantial step towards sodomy because no evidence suggested DeLeon removed her underwear or that he did so for the purpose of committing sodomy as opposed to another purpose.

found DeLeon pulled Victim's underwear down, the State did not prove that act was for the purpose of engaging in oral sex:

> But let's say—let's say that he was pulling the underwear down to—to rape here. Let's say he was pulling the underwear down because he likes to put underwear in his pocket because he's some freak that collects women's underwear. We don't know why this happened or if it happened or how it happened. But [the State's] burden in this case, on an attempted sodomy, [is to prove] that the defendant engaged in such contact for the purpose of committing such sodomy[.]

The State offered rebuttal testimony that the insufficient DNA found on Victim's vaginal swabs to identify a specific male profile could have been due to her urinating prior to her examination as indicated in her medical record. The State told the jury that Trial Counsel "really doesn't understand DNA evidence." The State pointed out that it did not conduct DNA testing on the sheets or pillowcases, and further argued that the defense could not argue that Victim's DNA was not found in DeLeon's mouth because DeLeon's buccal swab was not tested for Victim's DNA and was only used as a reference standard for the male profile.

The jury returned its verdict finding DeLeon guilty of attempted first-degree sodomy. The jury did not return a verdict on the charge of first-degree sodomy. The trial court sentenced DeLeon to fifteen years in prison. Following a direct appeal, which did not challenge the verdict director for the attempted offense, this Court affirmed DeLeon's sentence and conviction in State v. DeLeon, 604 S.W.3d 805 (Mo. App. E.D. 2020) (per curiam).

One of the claims of ineffective assistance of counsel alleged by DeLeon in his amended motion was Trial Counsel's failure to consult, retain, and/or call a DNA expert. At the evidentiary hearing, the motion court heard testimony from Trial Counsel and a forensic biologist (the "DNA Expert"). DeLeon testified via deposition. Relevant to this appeal, the DNA Expert explained there is a difference between primary and secondary DNA transfer. Specifically, "[p]rimary DNA transfer is when you directly deposit DNA by touching something

6

. . . from person to person or person to object." However, "after the primary transfer event has occurred, that DNA can then transfer again to a subsequent item that the primary person has never been in contact with," which is known as secondary transfer. The DNA Expert discussed a 2016 study about secondary transfer and testified that current technology allows for the development of full DNA profiles from secondary transfers. The DNA Expert further testified that it was possible Victim could have gotten some of DeLeon's DNA on her hands and then touched her own underwear and deposited DeLeon's DNA onto it.

Trial Counsel testified that he considered the State's DNA evidence before trial, including that K.M. found DeLeon's DNA on the hat and on Victim's underwear but not on Victim's vaginal area. Trial Counsel stated it was his opinion that the DNA evidence helped DeLeon's case. Trial Counsel noted that Victim's DNA was not found on DeLeon's mouth. When asked if he knew whether the swab taken from DeLeon's mouth was used solely as a reference sample to create a DNA profile, Trial Counsel said he would let the DNA Expert decide that. Trial Counsel testified that he had not previously tried a case featuring DNA evidence. Trial Counsel stated that he did not depose K.M. or send the DNA evidence for independent review.

Regarding the attempted offense on which DeLeon was convicted, Trial Counsel reiterated his strong objection to the language of the attempt instruction. Trial Counsel agreed the State had alleged that DeLeon transferred his DNA to Victim's underwear by direct touch. However, Trial Counsel stated he did not think the presence of DeLeon's DNA on the waistband of Victim's underwear was proof that DeLeon removed her underwear. When asked to elaborate on his strategy with respect to the underwear DNA evidence, Trial Counsel testified that DeLeon admitted to him that he put his hands inside Victim's underwear. Trial Counsel explained he did

not want to mislead the Court or the jury with evidence, statements, or testimony contrary to what DeLeon had told him. In his deposition testimony, DeLeon denied having made that admission to Trial Counsel. DeLeon also testified that he told Trial Counsel that he patted Victim on the shoulder and shook hands with her earlier in the evening, prior to the incident. Trial Counsel testified that secondhand touch transfer of DNA was not something he had considered. Trial Counsel agreed that if there had been evidence that DeLeon had shaken hands with Victim and she later potentially transferred DeLeon's DNA to her underwear by touching the waistband of her underwear herself, he would have wanted that information to go before the jury.

The motion court denied the claim for failure to consult, retain, and/or call a DNA expert, finding that Trial Counsel exhibited reasonable strategy. The motion court found that Trial Counsel effectively challenged the State's DNA evidence because DeLeon was only convicted on the lesser-included attempted offense. On appeal, DeLeon argues that the facts presented at the evidentiary hearing and relevant legal precedent require a finding that Trial Counsel's failure to independently investigate the DNA evidence and associated defenses amounted to ineffective performance that was not reasonable trial strategy in defending the charge of attempted sodomy. Further, DeLeon reasons he was prejudiced because a plausible defense of secondary transfer of his DNA to Victim's underwear was withheld from the jury.

Discussion

## I.     **Strickland Standard for Ineffective Assistance of Trial Counsel**

DeLeon is entitled to relief if he demonstrates by a preponderance of the evidence that "(1) his [trial] counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances and (2) his [trial] counsel's deficient

8

performance prejudiced him." Anderson v. State, 196 S.W.3d 28, 33 (Mo. banc 2006) (per curiam) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)).

To establish the performance prong, DeLeon must "overcome a strong presumption that [trial] counsel provided competent assistance." Beckett v. State, 675 S.W.3d 533, 540 (Mo. App. W.D. 2023) (quoting Deck v. State, 68 S.W.3d 418, 425 (Mo. banc 2002)). DeLeon must meet this standard by "identifying specific acts or omissions of [trial] counsel that, in light of all the circumstances, fell outside the wide range of professional competent assistance." Anderson, 196 S.W.3d at 33 (internal citation omitted). "[S]trategic choices made after a thorough investigation of the law and the facts relevant to plausible opinions are virtually unchallengeable[.]" McLaughlin v. State, 378 S.W.3d 328, 337 (Mo. banc 2012) (quoting Anderson, 196 S.W.3d at 33 (quoting Strickland, 466 U.S. at 690)). However, "strategy decisions made in the absence of investigation may be held to be ineffective assistance of counsel." State v. Baldridge, 857 S.W.2d 243, 259 (Mo. App. W.D. 1993) (citing Strickland, 466 U.S. at 691).

To satisfy the prejudice prong, DeLeon must show "there is a reasonable probability that, but for [trial] counsel's unprofessional errors, the result[] of the proceeding would have been different." Beckett, 675 S.W.3d at 540 (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Anderson, 196 S.W.3d at 33–34 (quoting Strickland, 466 U.S. at 694). Although it is insufficient for a movant to show only that the alleged error had some conceivable effect on the outcome of the proceeding, a movant is not required to show outcome-determinative prejudice. Cravens v. State, 50 S.W.3d 290, 294 (Mo. App. S.D. 2001) (quoting Strickland, 466 U.S. at 693). Rather, "[t]he Strickland test falls somewhere between these two extremes, and the issue becomes what effect the evidence would have had if it had been before the jury." Id. (internal citation omitted).

9

DeLeon must satisfy both prongs of the Strickland standard for his claim of ineffective assistance of counsel to warrant reversal of the motion court's judgment. Beckett, 675 S.W.3d at 540–41.

## II.     Failure to Consult, Retain, and/or Call a DNA Expert

It is important to recognize that DeLeon's claim of ineffective assistance is not limited to Trial Counsel's failure to call a DNA expert as a witness. DeLeon's allegation of ineffective assistance encompasses the broader claim including Trial Counsel's failure to consult, retain, and/or call a DNA expert. Importantly, DeLeon maintains that Trial Counsel's failure to investigate a plausible innocent explanation for DeLeon's DNA being detected on the exterior waistband of Victim's underwear was not reasonable trial strategy and unfairly prejudiced his defense. Trial Counsel's failure to investigate by consulting a DNA expert is the core of DeLeon's claim of ineffective assistance and his challenge to the motion court's judgment.[4]

"[Trial] counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Collings v. State, 543 S.W.3d 1, 16 (Mo. banc 2018) (quoting Strickland, 466 U.S. at 691) (finding trial counsel was not ineffective for failing to challenge DNA evidence where trial counsel undertook reasonable efforts to attempt to access the raw DNA files prior to trial and thoroughly cross-examined the State's expert at trial). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to [trial] counsel's judgments." Id. (quoting Strickland, 466 U.S. at 691). To prevail

---

[4] While the majority's analysis primarily focuses on prejudice, its limited discussion of the "conjectural nature of his secondary touch transfer theory" does not address trial counsel's failure to *consult a witness*, which implicates trial counsel's failure to investigate, thereby impacting the discovery of evidence at the outset of the case and, correspondingly, potentially impacts what evidence is presented to a jury. The Rule 29.15 amended motion clearly includes a claim of failure to consult a DNA expert and is not limited to a claim of failure to call a witness. The breadth of DeLeon's motion is critical to my analysis.

10

on a claim that trial counsel was ineffective for failing to consult or call an expert witness, a movant must show that: "(1) the expert existed at the time of trial; (2) the witness could be located through reasonable investigation; and (3) the testimony would have benefited the defense." McLaughlin, 378 S.W.3d at 350 (citing Zink v. Sate, 278 S.W.3d 170, 179 (Mo. banc 2009)).

Missouri courts have found clear error in a motion court's denial of post-conviction relief when trial counsel's failure to investigate through consulting an expert witness prohibits counsel from understanding available trial strategies, including theories of defense. See Beckett, 675 S.W.3d at 545–46; Cravens, 50 S.W.3d at 295; see also Baldridge, 857 S.W.2d at 259–60. In Baldridge, where the movant was seeking post-conviction relief from her conviction for first-degree murder, the defense theory was that the victim died by suicide through overdosing. 857 S.W.2d at 259. The amended motion alleged trial counsel's failure to consult an expert as to the cause of the victim's toxicity level unreasonably limited the movant's defense. Id. The movant averred that consulting an expert could have permitted trial counsel to argue that in fact no drug overdose occurred and thus there had been no foul play involving movant. Id. The motion court concluded that trial counsel thoroughly investigated the victim's medical condition and cause of death. However, the record on appeal showed only a superficial investigation in which trial counsel did not consult with the victim's physician, the pathologist who conducted the autopsy, or a toxicologist. Id. On appeal, Baldridge held the motion court erred in concluding without an evidentiary hearing that trial counsel's strategy was reasonable because trial counsel could not have made an informed decision about whether to rely solely on a theory that the victim committed suicide via overdose until he had adequately investigated whether the victim may have died from a gradual accumulation of her regular dosage. Id.

11

Here, our responsibility is to determine whether it was reasonable professional judgment for Trial Counsel to limit his investigation to reviewing the State's expert's report and not to make an independent inquiry or investigation regarding the DNA evidence that would have facilitated exploration of potential defenses to the charged sexual offense and its lesser-included offenses. See id. (citing Strickland, 466 U.S. at 690–91). "Strategic choices made after less than a thorough investigation are only reasonable to the extent that reasonable professional judgment would support the choice not to investigate further." Hannon v. State, 491 S.W.3d 234, 243 (Mo. App. E.D. 2016) (internal quotation omitted). Therefore, the initial inquiry is whether Trial Counsel undertook sufficient investigation to make an objectively reasonable decision not to further examine the State's DNA evidence by contacting an expert. See id. This determination must be made in view of the overall defense of the case. See Baldridge, 857 S.W.2d at 260. If we determine that Trial Counsel's failure to consult with a DNA expert was deficient performance, we must then evaluate whether there is a reasonable probability that the jury could have reached a different result had a DNA expert been consulted. See id. at 526.

A.      Trial Counsel's failure to independently investigate the State's DNA evidence by consulting an expert was not reasonable trial strategy.

The record shows that Trial Counsel's strategy of defense focused from the very beginning on the State's DNA evidence. Trial Counsel emphasized the absence of DeLeon's DNA in Victim's genital area, as well as on the bedsheets and pillowcases, and the lack of Victim's DNA on the buccal swab taken from DeLeon's mouth.[5] The State relied on explanations as to why DeLeon's DNA might not be found in Victim's vaginal area and focused heavily on evidence that DeLeon's DNA was present on Victim's underwear.

---

[5] The State did not test the bedsheets or pillowcases for DNA evidence. Likewise, the State did not test DeLeon's buccal swab for Victim's DNA.

12

I first note the DNA Expert who testified at the evidentiary hearing was available to Trial Counsel for consultation. The DNA Expert also was available and willing to testify at the time of trial. See McLaughlin, 378 S.W.3d at 350 (citing Zink, 278 S.W.3d at179); Stott v. State, 182 S.W.3d 728, 732 (Mo. App. S.D. 2006) (citing Cravens, 50 S.W.3d at 295). The DNA Expert's theory of secondary transfer was also available at the time of trial. Trial Counsel testified he had not previously tried a case with DNA evidence and had not considered secondary transfer during his investigation. Trial Counsel's investigation into the DNA evidence was limited to his review of the report of the State's DNA Expert, K.M. Trial Counsel reasoned that the State's DNA evidence was favorable to DeLeon because the evidence indicated DeLeon's DNA was found only on Victim's underwear and not on her genital area. Trial Counsel testified that "the only DNA that was found . . . was some of his DNA found on [Victim's] underwear. And that flies in the face of what [Victim] said happened." Trial Counsel explained it was his opinion that the State's DNA evidence was beneficial because the absence of DeLeon's DNA on Victim's vaginal area could not be reconciled with Victim's testimony that DeLeon engaged in oral sex for two to five minutes. Trial Counsel also found it relevant that Victim's DNA was not found on DeLeon's buccal swab, given that the charged conduct involved oral sex. Trial Counsel determined that cross-examining the State's DNA expert witness was a sufficiently effective defense strategy.

Given the lack of evidence placing DeLeon's DNA on Victim's vaginal area, I agree that Trial Counsel's initial analysis of the potential deficiencies of the State's DNA evidence was reasonable *to the extent that analysis provided strong arguments to counter the charge of first-degree sodomy.* However, when considering the entire record in this case, as we must, I am persuaded that the self-imposed limits of Trial Counsel's inquiry and investigation into the DNA

13

evidence unreasonably limited his investigation *with regard to attempted first-degree sodomy*. See Baldridge, 857 S.W.2d at 260; see also Spells v. State, 277 S.W.3d 343, 346–47 (Mo. App. W.D. 2009) (internal citation omitted) (noting a defendant is presumed to have notice of any lesser-included offenses to the offense charged). The particular facts of this case, including Trial Counsel's knowledge and experience as to DNA evidence, strongly indicate the need for at least a preliminary investigation by consulting a DNA expert. The State relies on McLaughlin to argue that Trial Counsel demonstrated reasonable strategy by choosing not to consult a DNA expert. However, the facts in McLaughlin pertaining to the alleged failure to investigate DNA evidence are significantly distinguishable from the facts presented to the motion court. See McLaughlin, 378 S.W.3d at 350. In McLaughlin, trial counsel made a strategic decision not to call a DNA expert to testify at trial *after consulting a DNA expert during the investigation,* including sending the DNA material to be independently tested. Id. at 349. The expert's testing revealed that the DNA evidence did not exclude the movant as a contributor. Id. Here, in contrast, Trial Counsel did not conduct an independent DNA inquiry or investigation or consult with a DNA expert prior to trial. Nor did trial counsel depose K.M., despite stating that his primary focus on the case was DNA and despite acknowledging that he lacked prior experience working a case centering on DNA evidence. See id.; see also Cone v. State, 316 S.W.3d 412, 417 (Mo. App. W.D. 2010) (finding trial counsel did not perform ineffectively when he made a diligent but unsuccessful effort to find expert rebuttal testimony by contacting ten to twelve experts, none of whom were willing to testify in movant's defense except one whose late endorsement was denied); State v. Dunn, 824 S.W.2d 533, 534 (Mo. App. E.D. 1992) (finding trial counsel exercised reasonable strategy in not consulting with an independent ballistics expert

14

where trial counsel went to the crime scene to check the bullets' trajectories and confirmed they were consistent with the State's theory and with his own defense theory).

The record shows that the presence of DeLeon's DNA on Victim's underwear was a critical part of the State's case against DeLeon on the charge of attempted sodomy. Indeed, as argued by the State in its closing argument "[t]he fact that [DeLeon's] and [Victim's] DNA is on the band of [Victim's] underwear is very important because that means that [DeLeon] touched the band of her underwear. And absence of the finding of DNA doesn't mean that there was no contact, but the presence of DNA does mean there was contact." Given the narrow parameters of the testimony elicited regarding DNA at trial, Trial Counsel was forced to concede that the presence of DeLeon's DNA on Victim's underwear proved that DeLeon physically touched the underwear. Accordingly, I would hold that it was incumbent upon Trial Counsel to make at least a preliminary inquiry and investigation regarding the underwear DNA evidence. Not undertaking any investigation of the underwear DNA evidence relegated Trial Counsel to a weaker defense, which included the admission in closing argument that DeLeon physically removed Victim's underwear but for a purpose other than committing sodomy. Without undertaking a reasonable investigation regarding the underwear DNA evidence, Trial Counsel could not reasonably strategize how to deal with such evidence, particularly in light of the available theory of secondary transfer, as explained below.

Because this Court must review DeLeon's claim of ineffective assistance considering Trial Counsel's overall defense of the case, I next examine whether consulting a DNA expert regarding secondary transfer would have benefitted DeLeon. See McLaughlin, 378 S.W.3d at 350 (citing Zink, 278 S.W.3d at 179); Baldridge, 857 S.W.2d at 257 (internal citation omitted).

Trial Counsel's primary defense theory was that DeLeon did not perform oral sex on Victim. The DNA evidence presented at trial provided Trial Counsel with a reasonable basis for pursuing that theory of defense. However, the State's theory regarding the charge of attempted sodomy was that DeLeon's DNA was deposited on Victim's underwear through **primary transfer** when DeLeon removed her underwear for the purpose of performing oral sex or as a substantial step towards performing oral sex. Importantly, whether DeLeon's DNA could have been deposited on the waistband of Victim's underwear through **secondary transfer** rather than primary transfer was relevant to rebutting the State's theory that DeLeon touched Victim's underwear, much less removed her underwear for the purpose of committing sodomy.[6] See Cravens, 50 S.W.3d at 297–98 (finding failure to call an expert was not reasonable strategy where "the expert testimony would have been wholly beneficial in that it would have corroborated [m]ovant's assertions and provided alternate inferences to be drawn from the evidence"); see also Sections 562.012 (attempt), 566.060 (first-degree sodomy).[7] Specifically, the DNA Expert testified that it was possible that if Victim got some of DeLeon's DNA on her hands earlier in the evening, then touched her own underwear, such as when going to the restroom, she could have deposited his DNA on her underwear. Indeed, DeLeon's testimony at the evidentiary hearing was that he told Trial Counsel he had physical contact with Victim earlier in the evening when he patted her on the shoulder and shook hands with her. The evidence of the courtyard socialization, at which both Victim and DeLeon were present, provided a sufficient basis for Trial Counsel to have elicited testimony from which a jury reasonably could infer the

---

[6] It is important to understand that the only evidence regarding the removal of Victim's underwear is purely circumstantial, as there is no direct evidence regarding the removal of Victim's underwear. Victim testified that she went to bed fully clothed and that when she awoke, she was not wearing underwear. Victim did not testify that she saw DeLeon remove her underwear. The State relies upon an inference that DeLeon removed Victim's underwear. I do not suggest that such an inference is unreasonable, but the fact that the only evidence relating to the removal of Victim's underwear is circumstantial is a factor in the prejudice analysis.

[7] Section references are to RSMo (2000) and (Cum. Supp. 2015), respectively.

16

possibility of a primary transfer of DeLeon's DNA from DeLeon to Victim's hand and a subsequent secondary transfer of DeLeon's DNA by Victim to her underwear. Evidence of secondary transfer thus potentially offered DeLeon a defense to both sodomy and the lesser-included offense of attempted sodomy by providing a scientifically plausible and innocent explanation for why DeLeon's DNA was detected on Victim's underwear.

The majority totally ignores DeLeon's testimony regarding the physical contact between him and Victim earlier in the evening in the apartment complex courtyard when it writes ". . . there is no factual basis for the application of the secondary touch transfer theory. . . [.]" The motion court similarly overlooks DeLeon's deposition testimony, as its Findings of Fact, Conclusions of Law, Order and Judgment contain absolutely no reference to DeLeon's testimony —not even to make a finding of credibility. The majority's suggestion that we reasonably can infer a credibility finding relating to DeLeon's testimony about having physical contact with Victim earlier in the evening is seriously undermined by the complete lack of any reference to DeLeon's testimony in the motion court's Findings of Fact, Conclusions of Law, Order and Judgment. The record before us simply does not present any credibility analysis or finding by the motion court, but instead suggests an oversight and lack of consideration of DeLeon's testimony.[8] I agree with the majority that we review the record in the light most favorable to the verdict, accepting as true all inferences that support the judgment. But I disagree with the majority that there exists any inference that we reasonably can draw from the record before us regarding the motion court's assessment of DeLeon's credibility. The motion court's analysis of secondary transfer focused solely on the presence of the hat in the bedroom. The motion court's

---

[8] While the motion court's Findings of Fact, Conclusions of Law, Order and Judgment specifically include a section labeled "Evidentiary Hearing Testimony," that section contains no reference to DeLeon's testimony that was introduced via deposition.

17

limited analysis of secondary touch, combined with the absence of any reference whatsoever to the allegations of physical contact in the courtyard, undermines the majority's reliance on an inference that the motion court considered DeLeon's testimony and found it to be not credible.

Relatedly, the motion court's finding that there was no evidence of contact to allow Trial Counsel to introduce evidence of secondary transfer strategy is refuted by the record—which includes DeLeon's testimony about physical contact that occurred during the courtyard socialization.[9] An objective reader of the motion court's Findings of Fact, Conclusions of Law, Order and Judgment is challenged on the motion court's finding because the motion court based its analysis of the secondary transfer issue solely on evidence of DeLeon's hat found at the scene and the absence of Victim's DNA on the hat. However, secondary transfer to Victim's underwear via the hat was only one of several means of secondary transfer suggested by DeLeon in his amended motion. At the evidentiary hearing, DeLeon's DNA Expert denied that her theory of secondary transfer involved the hat. The DNA Expert instead provided a basis for connecting DeLeon's deposition testimony about the courtyard contact between himself and Victim with a secondary transfer event.

Trial Counsel's failure to make a preliminary inquiry and consult a DNA expert regarding the DNA found on Victim's underwear limited his theory of defense to challenging only whether oral sex occurred. Had Trial Counsel consulted with the DNA Expert, the expert could have provided the jury with a scientific understanding of secondary transfer, which would have provided a means to dispute not only whether oral sex occurred, consistent with Trial Counsel's defense theory, but also whether DeLeon removed Victim's underwear, which was a

---

[9] Again, the motion court's characterization of the evidence – and the lack of any reference to the courtyard socialization -- even to dismiss such testimony as self-serving and not corroborated -- strongly suggests the motion court's oversight in reviewing DeLeon's deposition transcript as opposed to its rejection of said testimony.

18

required element in the jury instructions for the attempted offense. Compare Cravens, 50 S.W.3d at 297–98 with Stott, 182 S.W.3d at 732–34 (finding the proposed expert's testimony would not necessarily have benefitted the defense because it would have provided only limited impeachment of the forensic interviewer's technique). During the evidentiary hearing, Trial Counsel agreed that had there been evidence that DeLeon had shaken hands with Victim—which DeLeon testified he told Trial Counsel had occurred—and that Victim later touched her underwear, Trial Counsel would have wanted that information to go before the jury. However, Trial Counsel was precluded from even considering evidence of secondary transfer as a defense to sodomy and attempted sodomy because he did not pursue that possibility through any type of inquiry or investigation. Had Trial Counsel's investigation included consulting a DNA expert and learning about secondary transfer of DNA, Trial Counsel would have had the opportunity to consider a trial strategy based upon eliciting evidence regarding any physical contact between Victim and DeLeon prior to the incident, such as whether DeLeon touched her shoulder or shook her hand when they were drinking with friends in the same courtyard earlier in the evening. Trial Counsel then could have strategized whether to offer the jury an exculpatory explanation for the presence of DeLeon's DNA on Victim's underwear by means of secondary transfer that potentially could have led the jury not to return a guilty verdict. See Cravens, 60 S.W.3d at 297–98.

Introducing the concept of secondary transfer to the jury would have been fundamentally consistent with Trial Counsel's theory of the case that the State's DNA evidence did not convincingly show any sexual contact occurred between DeLeon and Victim and, as a result, would not have required Trial Counsel to choose between two conflicting defense theories. See Anderson, 196 S.W.3d at 33 (internal citation omitted) (noting trial counsel does not perform

19

unreasonably when, after investigating possible strategies, trial counsel chooses to pursue one reasonable strategy to the exclusion of another). I recognize that trial counsel may pursue an all-or-nothing defense and "will not be deemed ineffective 'for seeking to employ the best defense for [the] client by not offering the jury a middle ground for conviction.'" Jones v. State, 514 S.W.3d 72, 81 (Mo. App. E.D. 2017) (internal quotation omitted). However, even construing Trial Counsel's strategy in emphasizing the lack of DNA evidence on Victim's genital area as to the *completed* offense of sodomy as an all-or-nothing defense, Trial Counsel reasonably could have pursued the issue of secondary transfer as a complementary defense to both the completed *and* attempted offense of sodomy, because both defenses challenge the scenario presented by the State with regard to the DNA evidence.[10] Reasonable counsel would have considered presenting secondary transfer to the jury consistent with DeLeon's general denial of sexual contact and further benefitting DeLeon by providing a potentially meritorious defense to the offense of attempted sodomy. See Baldridge, 857 S.W.2d at 259 (citing Strickland, 466 U.S. at 691).

The majority reasons that we are foreclosed from considering the application of secondary transfer theory due to the lack of evidence on appeal establishing a factual basis for the application of said theory. But that is exactly the point of DeLeon's motion to vacate. Because Trial Counsel was unaware and uninformed on the scientific principles of secondary transfer, and because Trial Counsel did not consult a DNA expert to independently investigate

---

[10] Trial Counsel did not present any alternative theory explaining the presence of DeLeon's DNA on Victim's underwear. Instead, Trial Counsel presented arguments confirming that DeLeon removed the underwear—but challenged whether that act established the prerequisite "substantial step" to meet the requirements of an attempt. Trial Counsel argued that the lack of evidence of DeLeon's DNA on Victim's genital region where the alleged sodomy took place—as opposed to DeLeon's DNA "only" being found on her underwear—highlighted inconsistencies in Victim's testimony. In other words, Trial Counsel argued that because DeLeon's DNA was detected only on Victim's underwear, DeLeon could not have performed oral sex on Victim for two to five minutes as she testified or else DeLeon's DNA would have been found on her genital area as well. In this way, Trial Counsel's theory of defense essentially conceded that DeLeon had touched Victim's underwear, a fact required to satisfy the "substantial step" element of attempted sodomy.

20

the evidence relating to the presence of DeLeon's DNA on the waistband of Victim's underwear, Trial Counsel was not in a position to ask DeLeon, Victim, or any other witness about any physical contact between DeLeon and Victim when they were socializing in the apartment courtyard. As the majority notes in its opinion, Victim drank and socialized with a group of people, including DeLeon, at the apartment complex on the evening and night prior to the occurrence of the alleged sodomy. Knowing that Victim and DeLeon were physically present and drinking at a social gathering of various people underscores the significance of evidence that could support a defense based upon secondary transfer. Not pursuing any investigation of the that possibility explains why the record lacks evidence of any physical touching between Victim and DeLeon in the apartment courtyard and is precisely the reason Trial Counsel failed to perform with the customary skill and diligence of a reasonably competent attorney under similar circumstances. The majority opinion appears to focus on Trial Counsel's failure to call a DNA expert witness but lacks consideration of the Trial Counsel's failure to consult and retain a DNA expert witness so that Trial Counsel could effectively strategize a defense to the charge of attempted sodomy and to determine what evidence he should seek to introduce at trial. Without conducting a reasonable investigation, how could Trial Counsel reasonably strategize his defense for DeLeon? Therein lies one of my differences with the majority opinion.

The State places great emphasis on an argument that Trial Counsel reasonably strategized not to challenge the State's assertion that DeLeon touched Victim's underwear based on what DeLeon told him prior to trial. At the evidentiary hearing, in explaining his handling of the evidence of DeLeon's DNA on Victim's underwear, Trial Counsel testified that DeLeon told him

21

he put his hands inside Victim's underwear.[11]  I fully acknowledge Trial Counsel's explanation

of his handling of the presence of DeLeon's DNA on Victim's underwear.  However, an

admission from a defendant to an attorney does not relieve the attorney from the duty to present

a defense.  The State misstates the driving force behind the ethical considerations in this context

to arrive at an unjust result.  Trial Counsel's subjective belief about what happened based on

what DeLeon told him under attorney-client privilege may certainly *inform* Trial Counsel's

strategy.  But that knowledge does not negate Trial Counsel's professional responsibility to

provide DeLeon a viable avenue of defense, here, that the secondary transfer of DNA offered a

reasonably plausible and innocent explanation for the presence of DeLeon's DNA on Victim's

underwear.  See United States v. Wade, 388 U.S. 218, 256–58 (1967) (White, J., concurring)

(explaining that defense counsel's role to is not to ascertain or present the truth but "to put the

State's case in the worst possible light, regardless of what he thinks or knows to be the truth");

see also Hoeber v. State, 488 S.W.3d 648, 662 n.3 (Mo. banc 2016) (Fischer, J. dissenting)

(citing Strickland, 466 U.S. at 688) (noting "[c]riminal defendants are guaranteed *objectively*

effective assistance of counsel").  Secondary transfer offered the jury a plausible alternative

explanation for the presence of DeLeon's DNA without DeLeon ever physically touching

Victim's underwear.  Informing the jury that DNA can be transferred through either primary or

secondary touch would not have required Trial Counsel to offer perjured testimony or violate any

ethical rules.  See Mo. R. Bar Rules 4–3.3(a)(3) (prohibiting an attorney from knowingly

offering false evidence), 4–3.4(b) (prohibiting an attorney from counseling a witness to give

false testimony).  Offering evidence of a possible secondary transfer simply would have put the

---

[11] Attorney-client privilege is waived for purposes of a trial counsel's testimony about his strategy during post-conviction hearings.  See Neal v. State, 379 S.W.3d 209, 221 (Mo. App. W.D. 2012) (citing Stuckey v. State, 756 S.W.2d 587, 593 (Mo. App. W.D.1988)).

22

State to the test of proving DeLeon's guilt beyond a reasonable doubt. As Trial Counsel argued in closing argument, the State bears the burden to prove its case. Educating the jury that DNA can be transferred secondarily would have given the jury the opportunity to assess and weigh competing reasonable inferences, and then decide whether the State met that burden. Reviewing the record as a whole, I must reject any argument that Trial Counsel was free to concede unfavorable evidence rather than investigate potential viable defenses. See Wade, 388 U.S. at 256; see also Rios v. State, 368 S.W.3d 301, 314 (Mo. App. W.D. 2012) (internal citation omitted) (noting trial counsel's admission of evidence tending to support the State's position can be a significant factor in finding ineffective assistance of counsel). I understand that Trial Counsel focused his theory of defense on the completed act of sodomy and was inclined to do so due to the lack of evidence of DeLeon's DNA on Victim's body. I further note Trial Counsel's strong objection to the lesser-included attempt instruction. Nevertheless, Trial Counsel remained obligated to consider defenses to the lesser-included attempted offense, which reasonably competent counsel is expected to anticipate. See Spells, 277 S.W.3d at 346–47 (internal citation omitted). In closing argument, Trial Counsel addressed the charge of attempt by trying to establish doubt as to the "purpose" for which DeLeon removed Victim's underwear. By not investigating the DNA evidence with an expert witness, Trial Counsel abandoned a potentially viable defense that DeLeon never touched Victim's underwear. I simply cannot hold such conduct to be effective assistance of counsel.

I profoundly appreciate the maxim that courts should rarely second-guess trial counsel's strategic decisions, but such deference is exercised only when trial counsel has investigated relevant strategies. See Hannon, 491 S.W.3d at 245 (citing Middleton v. State, 103 S.W.3d 726, 736 (Mo. banc 2003)). I am also cognizant of the particular twists and turns of this case, where

23

the State did not indicate its intent to submit an instruction on attempted sodomy until late in the case. However, "[w]hile the duty to investigate does not require [trial] counsel to 'scour the globe on the off-chance something will turn up,' [trial] counsel does have a duty to conduct a reasonable investigation." Beckett, 675 S.W.3d at 541 (quoting Johnson v. State, 388 S.W.3d 159, 165 (Mo. banc 2012)). In my view, the record simply does not support the motion court's conclusion that Trial Counsel's failure to consult a DNA expert demonstrated reasonable strategy or performance. See Baldridge, 857 S.W.2d at 259 (citing Strickland, 466 U.S. at 691). Trial Counsel knew of the State's DNA evidence prior to trial. No surprise or late-disclosed evidence was presented at trial that could provide a reasonable explanation for Trial Counsel's failure to further investigate the DNA evidence with an independent expert. Trial Counsel knew of the potential for physical contact between DeLeon and Victim during the apartment courtyard socialization earlier in the evening and night, which opened the door for potentially introducing evidence related to secondary touch transfer and challenging a required element for conviction of attempted sodomy—DeLeon's removal of Victim's underwear. Because I am persuaded that DeLeon has met his burden to overcome the strong presumption that Trial Counsel provided competent assistance, I now turn to the majority's holding that DeLeon failed to prove the requisite prejudice needed to reverse the motion court's judgment denying DeLeon's amended Rule 29.15 motion for post-conviction relief. See Beckett, 675 S.W.3d at 540 (internal citation omitted).

    B.    <u>Trial Counsel's failure to independently investigate the State's DNA evidence by consulting an expert prejudiced the defense.</u>

DeLeon maintains he was prejudiced by Trial Counsel's ineffective performance because, had Trial Counsel conducted an investigation and inquiry into the State's DNA evidence, Trial Counsel would have learned about secondary transfer of DNA. A DNA expert

24

could have been consulted and/or called to testify about a plausible defense consistent with DeLeon's denial that any sexual contact occurred with Victim. DeLeon contends there is a reasonable probability he would not have been convicted on the charge of attempted first-degree sodomy had Trial Counsel presented evidence of secondary transfer to the jury.

In assessing whether the failure to consult and/or call a witness prejudiced the movant, we consider whether the proposed evidence would have been merely cumulative to that which was presented at trial. See Johnson, 388 S.W.3d at 166 (quoting McLaughlin, 378 S.W.3d at 343) ("Failure to present evidence that is cumulative to that presented at trial does not constitute ineffective assistance of counsel."). "Courts will . . . deny claims of ineffective assistance of counsel where a witness's testimony will be cumulative to another witness's testimony, including testimony elicited by trial counsel on cross examination." Beckett, 675 S.W.3d at 547 (citing Rios, 368 S.W.3d at 309). "Evidence is not cumulative 'when it goes to the very root of the matter in controversy or relates to the main issue, the decision of which turns on the weight of the evidence.'" Id. at 546 (quoting Black, 151 S.W.3d at 56).

Here, the DNA Expert testified at the evidentiary hearing that it is possible for DNA to be transferred secondarily after the primary transfer event, such that DNA can be transferred to an item with which the primary person has never been in contact. The DNA Expert further stated that current technology permits the development of full DNA profiles from secondary transfers. The DNA Expert opined that if Victim had gotten some of DeLeon's DNA on her hands, for example through a handshake or playing cards, Victim could have deposited DeLeon's DNA on her underwear when she touched the waistband. DeLeon testified that he told Trial Counsel he had physical contact with Victim earlier in the evening when he patted Victim on the shoulder and shook hands with her. Thus, we are to review the record to determine if Trial Counsel

25

elicited evidence relating to secondary transfer during his cross-examination of the State's DNA expert or if such testimony would have been cumulative to evidence already before the jury. We must further consider whether Trial Counsel otherwise effectively challenged the evidence of DeLeon's DNA detected on Victim's underwear. See id.; see also Harrington v. Richter, 562 U.S. 86, 111 (2011) ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation.").

A thorough review of the trial transcript shows Trial Counsel's cross-examination of K.M. did not address the issue of secondary transfer of DNA. Although the motion court found Trial Counsel was able to elicit statements from K.M. that DNA could be transferred by direct touch, which the record confirms, that finding does not address whether Trial Counsel elicited statements about the possibility of secondary transfer following a primary transfer event. For example, the handshake hypothetical Trial Counsel posited to K.M. was in the context of challenging whether oral sex occurred and did not suggest that anything other than direct touch accounting for the DNA evidence on Victim's underwear. DeLeon posits that Trial Counsel's argument at trial explained only part of the DNA evidence—the absence of individually identifiable male DNA on Victim's genital area. Importantly, DeLeon contends Trial Counsel failed to effectively address the presence of DeLeon's DNA found on the waistband of Victim's underwear. While Trial Counsel may have effectively challenged some of the DNA evidence in the case, "[i]n considering the prejudicial effect of movant's lawyer's ineffectiveness, . . . 'the right to effective assistance of counsel may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial.'" Black v. State, 151 S.W.3d 49, 57 (Mo. banc 2004) (quoting Deck, 68 S.W.3d at 429). In determining the presence or absence of Strickland prejudice, we must consider whether Trial Counsel's failure to address

26

the presence of DeLeon's DNA on Victim's underwear through secondary transfer is sufficiently prejudicial to outweigh Trial Counsel's otherwise effective performance when addressing the lack of DeLeon's DNA found on Victim's genital area.

I would hold that the motion court erred in concluding that DeLeon's proffered DNA Expert testimony would have been merely cumulative of Trial Counsel's defense strategy because Trial Counsel's defense of DeLeon focused solely on the primary transfer of DNA and Trial Counsel never explained or presented to the jury the possibility and implications of secondary transfer. Had Trial Counsel conducted an independent inquiry and investigation, he would have learned about secondary transfer of DNA. Trial Counsel then could have considered whether secondary transfer presented a viable defense for DeLeon and competently strategized whether to call and/or cross-examine witnesses regarding any interaction between DeLeon and Victim earlier in the evening and night when socializing with friends in the apartment courtyard. Trial Counsel could have strategized about the physical interaction between DeLeon and Victim to which DeLeon testified at the evidentiary hearing. Critically, without this knowledge, Trial Counsel was unable to consider a trial strategy that included secondary transfer as a defense. In simpler epistemological terms, we do not know what we do not know.[12] And it is the unknowns regarding the possibility of secondary transfer of DNA that undermined Trial Counsel's ability to effectively assist DeLeon in his defense. The record is clear that Trial Counsel did not elicit any testimony from K.M. acknowledging that DeLeon's DNA could have been transferred to Victim's underwear by any means other than primary touch. Accordingly, I cannot hold the DNA Expert's testimony would have been merely cumulative to K.M.'s testimony at trial. See Johnson, 388 S.W.3d at 166; Beckett, 675 S.W.3d at 547 (citing Rios, 368 S.W.3d at 309).

---

[12] Nicolaus Copernicus (1473–1543).

I find Cravens and Beckett instructive.  Cravens held that failure to adequately investigate by not consulting and/or calling expert witnesses in ballistics and forensic pathology constituted prejudicial ineffective assistance where the testimony would have offered a theory of defense that the movant did not shoot the victim in the manner charged.  Cravens, 50 S.W.3d at 296.  In that case, the movant sought relief from a conviction for second-degree murder, claiming he encountered the victim holding the gun underneath her chin, thought she was going to kill herself, reached for the gun, struggled with the victim to get it away from her, and the gun "went off."  Id.  At the evidentiary hearing, trial counsel testified that he reviewed the test-firing patterns and autopsy reports and noted the State had no witness who could conclusively testify as to the distance from which the fatal shot was fired.  Id. at 295.  However, trial counsel did not consult any independent experts and solely relied on his assessment of the State's evidence, in which the State's expert opined that the shot was made from a distance of six to eight feet.  Id.  In seeking post-conviction relief, the movant adduced testimony from two expert witnesses that the shooting had been at close-range.  Id. at 295–97.  Cravens found trial counsel's investigation unreasonable, noting "[c]ounsel cannot make a strategic decision against pursuing a line of investigation when he or she has not yet obtained the facts upon which such a decision could be made."  Id. at 295 (internal citation omitted).  Cravens found that even a perfunctory investigation would have uncovered expert witnesses whose testimony would have supported the movant's defense theory that the shooting was unintentional, thereby negating the intent element of second-degree murder.  Id.  In particular, Cravens found it relevant that the expert testimony would have corroborated the defense theory by providing alternative inferences of innocence to be drawn from the evidence.  Id. at 297.  Because those inferences could have altered the entire

28

evidentiary picture, <u>Cravens</u> determined the deficient performance was sufficient to undermine confidence in the trial's outcome, thereby establishing prejudice. <u>Id.</u>

More recently, <u>Beckett</u> found trial counsel prejudicially ineffective for failing to consult and/or retain a firearms expert where the expert could have verified the plausibility of the movant's defense that he did not intend to shoot the victim. <u>Beckett</u>, 675 S.W.3d at 541. There, the only evidence adduced at trial that the shooting could have been unintentional came from the movant's own testimony. <u>Id.</u> at 546. Trial counsel did not specifically cross-examine the State's firearms expert about whether she could rule out the possibility that the shooting was unintentional. <u>Id.</u> <u>Beckett</u> held trial counsel's reason for not calling a firearms expert—that the case did not involve a claim about the gun malfunctioning—was not reasonable strategy because the movant never testified that the gun malfunctioned but instead testified that he pulled the trigger unintentionally. <u>Id.</u> at 541, 545–46. <u>Beckett</u> concluded the movant was prejudiced because the expert testimony about the possibility of an unintentional shooting was not merely cumulative in that it could have corroborated the movant's testimony and went to the root of the defense theory in controversy. <u>Id.</u> at 546–47.

In this case, because Trial Counsel's cross-examination of K.M. did not elicit testimony that the presence of DNA can result from secondary transfer, I find the circumstances analogous to <u>Beckett</u> and <u>Cravens</u> in that ***the jury was left with but one inference to draw from DeLeon's DNA being found on Victim's underwear: that DeLeon directly touched her underwear.*** <u>See</u> <u>Beckett</u>, 675 S.W.3d at 546–47; <u>Cravens</u>, 50 S.W.3d at 296. Because the jury was instructed to decide whether DeLeon removed Victim's underwear as a substantial step towards sodomy, I would find that consulting and/or calling a DNA expert may have "alter[ed] the entire

evidentiary picture" and failure to do so was thus prejudicial. See Stott, 182 S.W.3d at 733–34 (quoting Cravens, 50 S.W.3d at 296 (quoting Strickland, 466 U.S. at 696)).

The majority notes certain factual distinctions between this case and Cravens, as well as the facts of State v. Barton, 936 S.W. 2d 781 (Mo. banc 1996) and Moore v. State, 827 S.W 2d 213 (Mo. banc 1992)—two cases cited by DeLeon in support of his prejudice argument. While I acknowledge some factual distinctions in these cases, it is clear to me that the focal point of the majority's view on prejudice is that the jury was presented with overwhelming evidence to support the jury's verdict on attempted sodomy, regardless of any evidence relating to secondary transfer of DeLeon's DNA to Victim's underwear. Without question, I agree with the majority that the record contains much evidence from which a jury could reasonably base a verdict of guilty. I agree that the jury would need to evaluate the strength of any evidence of secondary transfer in relation to other evidence before it, including the inconsistencies in DeLeon's statements to police, the presence of hat in the bedroom, testimony regarding Victim's emotional state, and Victim's own testimony. And it is certainly possible that even with evidence suggesting the possibility of a secondary transfer of DeLeon's DNA to Victim's underwear, the jury may have returned a guilty verdict on the charge of attempted sodomy. But I firmly differ with the majority opinion on the issue of prejudice because the failure of Trial Counsel to investigate and potentially present evidence of secondary transfer, *when combined with the jury's rejection of significant evidence through its failure to convict DeLeon on the charge of first-degree sodomy,*[13] undermines my confidence in the outcome of the trial. I proceed

---

[13] In its Findings of Fact, Conclusion of Law, Order and Judgment, the motion court mistakenly refers to the jury's failure to convict DeLeon of first-degree sodomy as a finding of not guilty. While the motion court is technically incorrect because the jury made no express finding of not guilty, Missouri courts have long recognized that "[a] guilty verdict for a lesser-included offense is, for double jeopardy purposes, an implied acquittal of the greater offense." State v. Glasgow, 250 S.W. 3d 812, 813 (Mo. App. W.D. 2008) (citing State v. Bally, 869 S.W. 2d 777,

30

cautiously in my analysis because I cannot dismiss the possibility that members of the jury may have questioned whether the State met its burden of proving that DeLeon removed Victim's underwear—a required element of attempted sodomy.  I am not persuaded that the record supports a finding that there exists such overwhelming evidence of attempted sodomy so as to negate a finding of Strickland prejudice.

The majority writes that the most important distinction between this case and those cited by DeLeon in his brief is that the evidence in DeLeon's case is not circumstantial and is consistent with DeLeon's guilt.  The majority advances this distinction as a reason to minimize the impact of the holdings in Cravens, Barton, or Moore on the case before us.

First, I do not agree with the majority's suggestion that circumstantial evidence was not at play in the jury's deliberations in this case.  Excluding the challenged evidence at issue—the presence of DeLeon's DNA on Victim's underwear—the other evidence against DeLeon— Victim's emotional state, the presence of the hat, DeLeon being at the apartment complex, and even DeLeon's inconsistent statements to police—is circumstantial evidence suggesting inferences as to DeLeon's conduct.

Specifically, evidence that DeLeon was near the apartment complex sometime after the incident and evidence of DeLeon's DNA on the hat recovered from the bed reasonably establish DeLeon's presence at or near the scene of the crime.  However, the theory of secondary transfer of DNA as a defense to sodomy and attempted sodomy does not dispute DeLeon's presence at the scene.  The defense admits DeLeon slept at Friend's apartment, where Victim also slept, and indeed *relies on* establishing DeLeon's presence coextensive with Victim's presence at the

778 (Mo. App. W.D. 1994) (citing Green v. United States, 355 U.S. 184, 191 (1957))) (additional citations omitted). Regardless of the characterization of the jury's action, the facts underlying this appeal present genuine issues of prejudice given the jury's rejection of at least some of the facts the majority proffers as "overwhelming evidence of guilt."

31

apartment. Evidence placing DeLeon at or near the scene of the crime is not overwhelming evidence that DeLeon removed Victim's underwear for the purpose of committing oral sex. See, e.g., State v. Dixson, 546 S.W.3d 615, 619 (Mo. App. E.D. 2018) (citing State v. Barnum, 14 S.W.3d 587, 591 (Mo. banc 2000)) (noting "mere presence at the scene of a crime is not enough to show affirmative participation"). Additionally, DeLeon's inconsistent statements to police are certainly relevant to his credibility, even though DeLeon did not testify at trial. Still, I do not view these inconsistent statements as overwhelming evidence proving the elements of the convicted offense. Further, the testimony from the responding police officer and Boyfriend that Victim was crying and distraught after the incident and claiming DeLeon raped her is relevant to Victim's credibility in claiming that she had been sodomized by DeLeon—*a claim rejected by the jury.*

Indeed, the only direct evidence that DeLeon sodomized or attempted to sodomize Victim was Victim's testimony. The State presented no evidence that anyone other than Victim saw or heard DeLeon commit or attempt to commit any sexual act toward Victim. Even Victim's testimony regarding the removal of her underwear is circumstantial as she did not see DeLeon touch or remove her underwear. With regard to direct evidence—this is a case of "she said, he said."

The majority posits that even if the jury would have believed evidence of secondary touch transfer of DeLeon's DNA to Victim's underwear, the jury still would have had to reject the remaining evidence tending to establish DeLeon's guilt in order to prove Strickland prejudice. The flaw in this argument is that the jury's decision not to return a verdict convicting DeLeon of first-degree sodomy is a rejection of a substantial and critical portion of Victim's testimony that DeLeon sodomized her—the only direct evidence against DeLeon—proffered by

32

the State as persuasive evidence of DeLeon's guilt. I do not lightly dismiss the jury's refusal to convict DeLeon of sodomy. I find this fact to be more than a "curious situation" as characterized by the majority. To be sure, reasonable inferences supporting guilt of the attempted offense can be drawn from evidence of Victim's demeanor after the incident, DeLeon's inconsistent statements to police, and the presence of DeLeon's hat on the bed. But the record clearly shows that the core of both the prosecution and defense of the charges of sodomy and attempted sodomy focused on DNA evidence. Evidence that DeLeon's DNA was on Victim's underwear—***without any evidence plausibly explaining how that could happen without DeLeon ever touching Victim's underwear***—reasonably would be viewed as convincing circumstantial evidence that DeLeon removed Victim's underwear, meeting the State's burden for proving that required element of attempted sodomy. I simply cannot ignore the emphasis the State placed on the presence of DeLeon's DNA on Victim's underwear as the linchpin for proving a charge of attempted sodomy. It is this fact that causes me to question what verdict the jury would have returned on the attempted sodomy charge had the jury been presented with evidence of secondary transfer.

The majority minimizes the jury's failure to convict DeLeon on the higher charge of first-degree sodomy, which I view as a significant failure of its analysis and argument. The jury's non-action on the charge of sodomy raises important questions as to what evidence at least some members found insufficient to meet the State's burden of proof. Knowing that some members of the jury necessarily rejected some of the evidence the majority characterizes as "overwhelming" undermines my confidence in knowing how the jury would have reacted to evidence of secondary transfer and what impact such evidence may have had on the charge of attempted

33

sodomy. Any attempt to rationalize how the jury might have reacted to such evidence is pure speculation. This issue is at the core of my dissent.

The majority justifies its marginal treatment of the jury's failure to convict DeLeon on the charge of first-degree sodomy by citing State v. Mellot, 733 S.W.2d 814, 816 (Mo. App. W.D. 1987), for the proposition that "juries frequently convict on some counts and acquit on others not because they are unconvinced of guilt but simply because of compassion and compromise." The majority continues its reliance on cases attempting to explain verdict inconsistencies by stating that "it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case," citing Cusumano v. State, 495 S.W.3d 231, 238 (Mo. App. E.D. 2016) (internal quotation omitted). I first note that Mellot involves a claim of inconsistent verdicts on direct appeal and does not address the issue of whether a trial counsel's alleged ineffective assistance undermines confidence in the verdict. See Mellot, 733 S.W.2d at 814–16. Mellot does not analyze the potential impact of a trial counsel's failure to investigate and introduce evidence of a plausible explanation for otherwise incriminating evidence on a jury's deliberation and verdict. See id. The Western District's comments on how juries may reach a verdict in Mellot have no bearing or relevance on DeLeon's motion for post-conviction relief. Compare Hoeber v. State, 488 S.W.3d 648, 657 (Mo. banc 2016) (applying the Strickland standard for prejudice to find trial counsel's failure to object to inconsistent verdicts constituted ineffective assistance of counsel) with Mellot, 733 S.W.2d at 816 (applying the direct appeal standard for prejudice when holding that any inconsistencies in the jury's verdict did not warrant reversal). The majority gets a bit closer with its reference to Cusumano, but still widely misses the mark. While Cusumano does involve claims of post-conviction relief, our Court's holding in that case on the claim of ineffective assistance of appellate counsel did not address the

34

issue of prejudice raised by DeLeon in his amended motion. See Cusumano, 495 S.W.3d at 234, 237–38 (finding appellate counsel did not perform ineffectively by not citing certain opinions about implied acquittals from the Supreme Court of the United States, including Green, 355 U.S. 184, when seeking to set aside a conviction on retrial on double jeopardy grounds, because the cases were inapplicable in that there had been no implied acquittal where his first jury had not been instructed on lesser-included offenses for challenged count and reached no verdict on it). Critically, what the Court in Cusumano did not address was the potential impact of trial counsel's failure to investigate and introduce evidence of a plausible explanation for otherwise incriminating evidence on a jury's deliberation and verdict.

The majority correctly affirms a basic and simple principle that undermines its holding and supports my dissent. What the courts in Mellot and Cusumano reasoned is correct: we will never know the basis for why the jury in this case did not return a guilty verdict against DeLeon on the first-degree sodomy charge. We cannot know what evidence the jurors found credible or the reason the jury did not find the State met its burden of proof on the charge of sodomy. The fact the majority identifies a concern with the verdict's consistency should resolve the question of Strickland prejudice in DeLeon's favor because we cannot speculate how the jury arrived at its finding of guilt on the attempted offense of sodomy and its implied acquittal on the completed offense of first-degree sodomy. See McConnell v. State, No. SD37250, 2024 WL 748702, at *10 (Mo. App. S.D. Feb. 23, 2024) (Burrell, J., dubitante) (internal quotation omitted) (scrutinizing the practical application of the Strickland standard and explaining the fact that the movant was convicted following a **bench** trial supported his dubitante vote in the majority's denial of post-conviction relief, but had the movant been found guilty by a **jury** then "we might never know if there was a 'reasonable probability that, but for counsel's unprofessional errors,

35

the result of the proceeding would have been different'"). That uncertainly is exactly the reason I posit that we cannot know what verdict the jury would have returned on the charge of attempted sodomy had the jury been informed of the science and evidence of secondary transfer.

Any analysis of prejudice in this case is challenged and necessarily impacted by the jury's failure to return a guilty verdict on the first-degree sodomy charge. The jury's refusal to convict DeLeon on the charge of first-degree sodomy suggests the jury did not find Victim's account wholly credible. Although we cannot presume to know precisely what the jury believed, jurors are free to believe or disbelieve any evidence presented. See State v. Smith, 522 S.W.3d 221, 226 (Mo. banc 2017) (internal citation omitted) (noting "there is always a basis in the evidence to acquit the defendant of the charged offense because the jury is free to disbelieve any or all of the evidence presented"). Because the jury evidently rejected Victim's testimony that DeLeon orally sodomized her, I am not persuaded that Victim's testimony, in combination with the other evidence outlined above, supports a finding of no Strickland prejudice. The overwhelming-evidence standard is not easily defined but has been described as a case in which even if tried one hundred times, the defendant would still be convicted *with or without the challenged evidence*. State v. Dexter, 954 S.W.2d 332, 342 (Mo. banc 1997) (emphasis added) (quoting State v. Martin, 797 S.W.2d 758, 765 (Mo. App. E.D. 1990)). As Trial Counsel testified, consistent with the opening and closing statements of both the State and defense at trial, the prosecution of this case focused primarily on DNA evidence, which the verdict reflects. Even taking into account the non-DNA evidence adduced at trial and accompanying reasonable inferences, I am persuaded that Trial Counsel's failure to provide the jury with evidence relating to secondary transfer of DNA presents a sufficiently significant issue undermining my

36

confidence in the jury's verdict on the charge of attempted sodomy.  <u>Anderson</u>, 196 S.W.3d at

33–34 (quoting <u>Strickland</u>, 466 U.S. at 694).

The motion court accurately noted that the DNA Expert acknowledged that DNA is more

likely to be left behind by primary rather than secondary touch, and therefore the motion court

found the DNA Expert's testimony regarding secondary transfer to be inconclusive and thus non-

prejudicial.  In so finding, the motion court held DeLeon to a higher standard of prejudice than

<u>Strickland</u> requires.  Under well-established Missouri precedent, Deleon is not required to show

that Trial Counsel's ineffectiveness was outcome-determinative.  <u>See</u> <u>Cravens</u>, 50 S.W.3d at 298

(internal citation omitted).  To be sure, "<u>Strickland</u> and the Missouri decisions following it create

a strict standard, but the purpose is not to set an impossible standard."  <u>Id.</u> (internal citation

omitted); <u>see also</u> <u>Beckett</u>, 675 S.W.3d at 544 (quoting <u>Perkey v. State</u>, 68 S.W.3d 547, 552 (Mo.

App. W.D. 2001)) (noting that while trial counsel's failure to consult or call a firearms expert

may or may not have changed the overall result, "that very real probability cannot be ignored,

and meets the minimum standard of undermining confidence in the outcome of the case").  The

facts here provide an even stronger basis for prejudice than in <u>Beckett</u> because the jury in

<u>Beckett</u> heard the defense theory through the movant's self-serving testimony, which the expert's

testimony could have corroborated.  Here, the jury was not presented any evidence regarding

secondary transfer of DNA and was deprived of the opportunity to consider whether secondary

transfer provided DeLeon a defense to the charge of attempted sodomy.  <u>See</u> <u>Beckett</u>, 675

S.W.3d at 546–47.  The State assails the relative strength of the theory of secondary transfer and

attempts to guess what the jury would have believed had it been presented with such evidence.

While I understand the State's argument, that is not the standard for <u>Strickland</u> prejudice.  I

maintain that we simply cannot know what weight, if any, the jurors may have given evidence

related to secondary transfer of DNA in relation to Victim's underwear because the jury was denied the opportunity to consider such evidence. That unknown undermines my confidence the jury's verdict.

The DNA Expert noted technological advances in DNA analysis allow for the identification of DNA profiles from secondary transfers. Trial Counsel was not knowledgeable about the potential defense of secondary transfer and thus did not have the opportunity to strategize as to the application of that scientific principle to his defense of DeLeon, such as by questioning a retained expert or asking witnesses about any interaction between Victim and DeLeon prior to the incident. In this way, the failure to investigate at the outset of the case impacted the entire approach to DeLeon's defense, thereby altering the evidentiary picture presented to the jury. Had secondary transfer of DNA been presented to the jury, there is a reasonable probability sufficient to undermine my confidence in the outcome of the trial because members of the jury may have questioned whether the State met its burden of proving that DeLeon removed Victim's underwear—a fact the State must prove to obtain a guilty verdict on the attempt charge. See Beckett, 675 S.W.3d at 543 (citing Cravens, 50 S.W.3d at 296) (noting the evidentiary picture may be altered when trial counsel's error leaves the jury with only one unfavorable inference to draw from the unchallenged evidence). The verdict shows that the jury did not believe the State carried its burden of proof on the first-degree sodomy charge. I am not so confident in the outcome of the case to hold that the same jury may not have considered the issue of secondary transfer when deliberating on the attempted sodomy instruction, *especially when the only substantial step identified in the instruction was DeLeon's physical removal of Victim's underwear*. Evidence of secondary transfer potentially provided a plausible alternative explanation for the presence of DeLeon's DNA on Victim's underwear. If believed by the jury,

38

there is a reasonable probability that such evidence could have resulted in the jury not returning a guilty verdict on attempted first-degree sodomy, similar to the jury's resolution of the sodomy charge.  See Cravens, 50 S.W.3d at 298.

For that reason, I disagree with the majority and find that Trial Counsel's failure to consult and/or call a DNA expert resulted in Strickland prejudice.  See Beckett, 675 S.W.3d at 540 (quoting Strickland, 466 U.S. at 694).  I would hold that DeLeon has met both prongs of the Strickland standard by the preponderance of the evidence adduced at the evidentiary hearing to demonstrate ineffective assistance of counsel.  See id. at 540–41.  Accordingly, I would hold that the motion court clearly erred in denying DeLeon's Rule 29.15 amended motion for post-conviction relief, grant Point One which is dispositive of the appeal, and reverse and remand for a new trial.  See Rule 29.15(k).

_____
KURT S. ODENWALD, Presiding Judge